## FORM FOR USE IN APPLICATIONS
### FOR HABEAS CORPUS UNDER 28 U.S.C. §2254
### FIRST AMENDED COMPLAINT

Provided to Walton CI
On _____ for Mailing
        Date

NAME: JOHNNY EMERY

Inmate's Initials _____

PRISON NUMBER: 125075

NAME OF PLACE OF CONFINEMENT: Walton Correctional Institution,

ADDRESS OF PLACE OF CONFINEMENT: Walton Correctional Institution
                                 691 Institution Road (Main Unit)
                                 DeFuniak Springs, Fl 32433

THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF FLORIDA, Jacksonville DIVISION

CASE NO.3:07-cv-440-J-32HTS

(TO BE SUPPLIED BY CLERK OF U.S. DISTRICT COURT)

John Emery_____,
PETITIONER
(FULL NAME)        ( INCLUDE NAME UNDER WHICH YOU WERE CONVICTED)

VS.

James McDonough, Secretary-Florida Department of Corrections,
RESPONDENT
(NAME OF WARDEN, SUPERINTENDENT, JAILER, OR AUTHORIZED PERSON HAVING CUSTODY OF PETITIONER)

AND

THE ATTORNEY GENERAL OF THE STATE OF FLORIDA,

BILL McCOLLUM_____,
ADDITIONAL RESPONDENT

(If petitioner is attacking a judgment which imposed a sentence to be served in the future, petitioner must fill in the name of the state where the judgment was entered. If the petitioner has a sentence to be served in the future under a federal judgment which he wishes to attack, he should file a motion under 28 U.S.C. §2255, in the federal court which entered the judgment.)

# PETITION

1.  Name and location of court which entered the judgment of conviction under attack and state court case number(s):  Circuit Court of the Fourth Judicial Circuit of Florida    00-521-CF

2.  Date of judgment of conviction: Thursday, January 10, 2002

3.  Length of sentence: Count I-Life and Count II-15-Years

4.  Sentencing judge: William Wilkes

5.  Nature of offense or offenses for which you were convicted: Count I- First Degree Murder and

    Count II-Armed Robbery (Attempted)

6.  What was your plea?   (Check one)

    (a) Not guilty         ☒
    (b) Guilty             ☐
    (c) Nolo contendere    ☐

    If you entered a plea to one count or indictment, and a not guilty plea to another count or

    indictment, give details:

7.  Type of trial:   (Check one)

    (a) Jury ☒              (b) Judge only  ☐

8.  Did you testify at the trial?    Yes ☒        No ☐

9.  Did you appeal from the judgment of conviction?  Yes ☒        No ☐

10. If you did appeal, answer the following:

    (a) Name of Court: First District Court of Appeal, STATE OF FLORIDA

    (b) Result: Affirmed

    (c) Date of Result: Friday, March 07, 2003

    If you filed a second appeal or filed a petition for certiorari in the Florida Supreme Court or the

    United States Supreme Court, give details:

11. Did you file any postconviction motions under either Florida rule of Criminal Procedure 3.800 or

3.850 with the state trial court or any other postconviction motions or petitions for writ of habeas corpus with the state trial court or state appellate court to this judgment and conviction? Yes ☒     No ☐

12. If you did file any matters within the realm of question 11, answer the following as to each motion or petition.  Attach separate pages as needed for each motion or petition filed.

 (a) The type of motion/petition filed: **Fla.R.Crim.P.** 3.800 MOTION TO CORRECT AN ILLEGAL SENTENCE AND **Fla.R.Crim.P.** 3.850 Motion For Post Conviction Relef

 (b) Date motion/petition filed: 3.800 FILED ON August 24, 2003 AND 3.850 FILED ON November 5, 2004

 (c) Name of court: BOTH FILED IN THE FOURTH JUDICIAL CIRCUIT OF FLORIDA

 (d) Result: BOTH SUMMARILY DENIED

 (e) Date of result: Wednesday, February 04, 2004

13. If your motion or petition described in paragraph 12 was denied, did you file an appeal of that denial with the appropriate state appellate court? Yes ☐     No ☒

 As to each motion or petition (attach separate pages as needed) indicate:

 (a) Name of court where appeal filed: First District Court of Appeals

 (b) Date appeal filed: October 2, 2006

 (c) Result: Denied

 (d) Date of result: April 02, 2007

14. State concisely every ground on which you claim you are held unlawfully.  Summarize briefly the facts supporting each ground.

 **CAUTION:** In order to proceed in the federal court, you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court.  As to all grounds on which you have previously exhausted state court remedies, you should set them forth in this petition if you wish to seek federal relief.  If you fail to set forth all such grounds in this petition, you may be barred from presenting them at a later date.

 For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings.  Each statement preceded by a letter constitutes a separate ground for possible relief.  You may raise grounds which you may have other than those listed if you have exhausted all your state court remedies with respect to them.  However, you should raise in this petition all available grounds (relating to this conviction on which you base your allegations that you are being held in custody unlawfully.

 If you select one or more of these grounds for relief, you must allege facts in support of the ground or

grounds which you choose. Do not check any of the grounds listed below. The petition will be returned to you if you check (a) through (j) or any one of these grounds.

(a)     Conviction obtained by a plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequence of the plea.

(b)     Conviction obtained by use of coerced confession.

(c)     Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure, (where the state has not provided a full and fair hearing on the merits of the fourth amendment claim).

(d)     Conviction obtained by use of evidence obtained pursuant to an unlawful arrest, (where the state has not provided a full and fair hearing on the merits of the Fourth amendment claim).

(e)     Conviction obtained by violation of the privilege against self-incrimination.

(f)     Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g)     Conviction obtained by the violation of the protection against double jeopardy.

(h)     Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i)     Denial of effective assistance of counsel.

(j)     Denial of right of appeal.

A.     Ground one: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, *Strickland V. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984)

Supporting **FACTS** (tell your story briefly without citing cases or law):

COUNSEL WAS INEFFECTIVE IN FAILING TO PRESENT SUFFICIENT FACTS AND WITNESS TO ESTABLISH STANDING IN HEARING HELD ON MOTION TO SUPPRESS.

On December 20, 2001, a hearing was held to suppress a statement given to officers allegedly by

Defendant Emery during custodial interrogation. The Defendant's Attorney, Mr. Refik Eler, alleged that the statement in question was involuntary given in violation of Emery's Rights under the Fifth Amendment of the United States Constitution; physical abuse was the focal point of Defense Counsel's argument

Defendant Emery claims that Counsel was ineffective for failing to investigate certain facts that could have been produced at the December 20th hearing as well as for failing to call witness that could have substantiated Emery's claim that his confession was induced as a result of not only physical abuse but also as the result of promises made. The promise being made in the form of a visit shown to have occurred with the Defendant's girlfriend.

The Defendant contends that had Counsel compiled the allegations of physical abuse with testimony supporting that a visit was given in exchange for the statement. The result of the Suppression Hearing would have been different. During the hearing, the prosecution initially called three total witnesses, Lieutenants Bennett and Redmond (the investigating officers), Vicki Eaves, who is the Stenographer that recorded Defendant's statement. These witnesses all testified that the legal requirements for obtaining the statement were met and that nothing improper occurred during the day the Defendant's statement was taken. There was reference made to the confusion the Defendant had regarding the ability to retain Counsel, and the numerous times the officers clarified the confusion.

Counsel for the Defense called only the Defendant with no preparation, and entered three photographs that depicts injuries the Defendant asserted had occurred during the interrogation with the above-mentioned police officials. The prosecution in turn, called three-rebuttal witness to attempt to disprove the physical injuries Defendant received. Counsels Motion to Suppress was denied. And, the statement of Defendant as well as the prosecutions witness were admitted at Defendant's trial. Trial Counsel was fully aware of an earlier deposition taken August 29, 2000 of one Captain Allen Trew. In his deposition, Captain Trew stated Defendant and his girlfriend; Misty Danielowicz had been allowed a visit because of his making arrangements for them to speak. (Exhibit A). This deposition not only coincided

with Defendant's testimony[1] , but also contradicts the earlier deposition and testimony of both Lieutenants, in stating that Misty Danielowicz was not at the jail and that no visit occurred between the two. (Exhibit C-F).

Captain Trew's deposition also contradict's the State's rebuttal witness, Chuck Brannon's testimony that Defendant's appearance was that of being dirty and having a scratched red face. Thus, implying Defendant's injuries occurred during his arrest and not during the Defendant's interrogation as the Defendant testified. (Exhibit G). Said witness would have confirmed that her visit coincided with Captain Allen Trew and Defendant Johnny Emery thereby altering the outcome of the Suppression Hearing. Defense Counsel initially requested the Court to withhold ruling until Counsel could call Ms. Danielowicz for the Suppression Hearing. (Exhibit H). When Ms. Danielowicz was before the Court (Exhibit I), Counsel decided not to use her testimony. Said witness was available to testify and no prejudice would have arisen from Counsel calling her to testify at the hearing

The decision, albeit possibly a tactical one was made without the Defendant's consent or contemplation of Captain Allen Trew's earlier deposition and fell below the reasonableness of an effective attorney. Ms. Danielowicz was available and should have been called. Defendant argues that this witness if called would show that a quid pro quo agreement occurred for the Defendant's confession. The State would not have been able to show Defendant's confession was not induced by promise of a visit had counsel presented the testimony of said witness.

Even if the Court denied the Defendant's Motion to Suppress, provided the additional evidence would have been presented by Trial Counsel, Counsel at a bear minimum should have allowed the trier of fact to hear the testimony of said witness and decide the voluntariness of Defendant's confession at trial.

Had Trial Counsel called the forementioned witness to testify at the Suppression Hearing on Defendant's behalf, the Court would have found that the Defendant's confession was impermissibly

---

[1] Defendant Emery testified that he was given a visit after being beaten and threaten in exchange for his statement (See Exhibit B)

induced by the promise of a visit with the Defendant's girlfriend, and the physical abuse administered by Police Officials. Based on the above contentions the Trial Court would have found Defendant's confession involuntary and dismissed the same. Absent consideration of the Defendant's confession by the jury there is a chance the outcome of trial would have been different, because there would have been no evidence implicating the Defendant in the charged crime beyond a reasonable doubt.

Exhaustion of ground one in the state courts:

    (1)    Did you raise ground one in the appropriate Florida District Court of Appeal on a direct appeal of your conviction?    Yes ☐     No ☒

    (2)    After your conviction did you raise ground one in the state circuit court that sentenced you by filing a Florida Rule of Criminal Procedure 3.850? Yes ☒    No ☐

        (a)    If your answer is "yes", then state:

            i.    Date motion filed: Friday, November 05, 2004

            ii.    Whether you received an evidentiary hearing: NO

            iii.    Result: Denied

            iv.    Date of the result: Sunday, August 06, 2006

        (b)    If your Rule 3.850 Motion was denied, then did you file an appeal of that denial with the appropriate Florida District Court of Appeals? Yes ☒ No ☐

            i.    If you failed to appeal the denial of your Rule 3.850 Motion, then explain briefly why:

            ii.    Date appeal filed, result of appeal, and date of result: DATE FILED: October 2, 2006, RESULT: AFFIRMED, AND DATE OF RESULT: APRIL 2, 2007

    (3)    Have you raised ground one in any other petition, application, or motion filed in the state courts of Florida? Yes ☐    No ☒

        If your answer is yes, then give the details, including the date the petition, application, or motion was filed, grounds raised, the court's decision, and the date of said decision for each such petition, application, or motion, whether there was an appeal of each decision,

and the result of the appeal:

B.      Ground two: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, Strickland V.

Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984)

Supporting **FACTS** (tell your story briefly without citing cases or law):

INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON COUNSEL'S FAILURE
TO OBJECT AND PRESERVE NON-COMPLIANCE WITH MOTION IN LIMINE.


A hearing on a Motion in Limine regarding comments prosecution witness were anticipated to

testify to, was held on January 8, 2002; the Defendant's motion was concerned with the witnesses'

inflammatory comments which pertained to allegations the Defendant, John Emery was overheard saying

regarding the charged offense. The primary basis of Defense Counsel's Motion in Limine was concern

with the State witnesses' testimony misidentifying the victim as a law enforcement officer. Counsel argued

against the admission of said testimony and Defense Counsel's motion was ultimately granted thereby

limiting any reference to the victim being a police officer by the State witnesses.

After proffering the witness, and the concessions the Prosecutor and Court made, the Prosecutor

subsequently violated this concession in opening argument and throughout witness testimony. Counsel

failed to recognize the violations and failed to object to this violation thereby failing to preserve this error

for Appellate Review. The Defendant claims that his Attorney's failure to object and preserve the

prejudicial comments made by the Prosecutor and her witness rendered his assistance ineffective.

Counsel's deficiency deprived the Defendant of his right to effective assistance and his right to a fair trial

as assured by the Sixth Amendment to the United States Constitution.

The court, along with Defense Counsel was concerned about the prejudicial nature of the jury

hearing any mention of the term "COP"...or "KILLING A COP" during the testimony of the State's

witness, as illustrated during the hearing on Defendant's Motion in Limine, during the hearing the Court

questioned:

"What's the relevance of killing a cop part of it except to inflame the jury here? I mean obviously it's all

right for him to say he'd like to go back out and kill somebody again... but to add that part about the

cop... "

(T.T. Vol. IV pg. 75, ln. 7-14)

The Prosecutor stated that the relevance was with what the Defendant allegedly told witness, to

which Defense Counsel responded:

... Its more prejudicial than probative... the only mention about this cop comes from Emery's alleged

statement to the police... I mean I can see the courts analysis earlier" I want to go out and do it again sort

of relevant and probative...but this is clearly outside the realm of what I think is material to a relevant

issue in the case. I mean the victim is dead whether he's a cop or a human being or a civilian and the cop

issue I think is inflammatory.                    (T.T. Vol. IV pg. 76, ln. 6-10)

To resolve the issue, the Prosecutor proposed the following concession:

"Judge what if we limit his testimony just to say that he heard him say: I watch the guys blood spill and I

wanted to go out and do it again."

The Court: I don't have any problem with that because it goes to prove that he did the crime he's being

tried for.

(T.T. Vol. IV pg. 76, ln. 11-17)

Unfortunately, prior to the concession being made, the prosecution had already gone against her

own concerns of not wanting to talk about it during opening (T.T. Vol. IV pg. 13, Ln. 1-3), and the

courts admonition against mentioning said facts in opening (H.T. Vol. IV pg. 11, Ln. 8-11). The jury had

already been tainted by false and inflammatory comments, which Attorney Eler decided to allow. To add

9

insult to injury, the very first thing the Prosecutor stated in her opening argument was that the victim said he was a cop (T.T. Vol. IV pg. 18, ln. 3-6). There are too many examples to list here, but a review of the record will show that the jury was subject to a false sense of the victim's status. There is no doubt that had Attorney Eler held the prosecutor to the limitations the Prosecutor set for herself, the outcome of trial would have been different.

The court refused to proffer the first four or five witness (T.T. Vol. IV pg. 13, ln. 9-15); in doing so, only one witness was really proffered. The court decided that assuming the testimony was admissible for this witness; testimony would be admissible for the other witness because the testimony consists of the same comment. Defendant points out that the courts implication was that if it was not admissible for one witness, then it would not be admissible for any witnesses. Once the State conceded to not having the proffered witness testify to the victim's alleged status, the State was obligated to refrain from using the inflammatory comments throughout trial.

The prosecution even requested the court on two separate occasions, to "instruct" their witness not to testify in the context of what everyone was trying to avoid (T.T. Vol. IV pg. 11, ln. 12-14 and pg. 76, ln. 18-19). Considering the comments in the context of the entire trial, there is a reasonable probability that the comments and testimony changed the result of the trial. There is no way to gauge the degree to which the unchallenged remarks mislead the jury and prejudiced the Defendant because they were used solely to play on the sympathy of the jurors. There can be a reasonable inference that anyone would have more compassion for a law enforcement officer being shot outside his line of duty. The comments were not isolated, they were beyond extreme, and almost every witness the prosecution called mentioned the incorrect status of the victim.

Lastly, the comments cannot be said to have been accidental, because as said before, the Prosecutor led the court and defense to believe that the witness would be instructed not to say them and had concerned herself with not wanting to say them during argument. The inflammatory testimony should be viewed in the totality of the ways they were used, by using the comment in opening argument, by each

witness stating it and by closing with the comments. The State cannot claim that the errors were harmless.

The following are several examples of the improper comments and where they can be found:

- ... and the victim said, wait I'm a cop (T.T. Vol. IV pg. 20, ln. 10);

- ... the man said, I'm a cop (T.T. Vol. IV pg. 103, ln. 1-2);

- ... the guy holds his hands up and says I'm a cop (T.T. Vol. IV pg. 193-94); and

- ... I'm a cop, he panicked and shot the guy (T.T. Vol. IV pg. 681, ln. 25).

No objections were made and there was no clarification to the jury as to the victim's real status. No one ensured that the jury was not influenced by the thought of the victim being a cop when he was not. No one remembered or abided by the mandates of the Motion in Limine and Trial Counsel's failure to object was well below both prongs of the Strickland analysis. Not only should Counsel have ensured that the Defendant receive a fair trial, Counsel was obligated to move the court to ensure the State adheres to the laws and orders of the court; he simply did not. His deficiency allowed the Prosecutor free reign to bolster the character of the victim and to prey upon the emotions and sympathy of the jury through testimony and her opening and closing argument.

Trial Counsel should have moved for a mistrial based on the States flagrant and repeated violations of Counsel's Motion in Limine regarding the victim's status of being a law enforcement officer. Counsel's failure to do so, denied Defendant an ample opportunity to ensure that the jury did not hear the improper comments. Throughout the trial, Counsel's failure to object each time the issue regarding the victim's status was raised was a blatant acquiescence to the State's improper conduct. Had Counsel objected to and moved for a mistrial, the results of trial would have been different.

Exhaustion of ground one in the state courts:

(1)   Did you raise ground two in the appropriate Florida District Court of Appeal on a direct appeal of your conviction?          Yes ☐          No ☒

(2)   After your conviction did you raise ground two in the state circuit court that sentenced you by filing a Florida Rule of Criminal Procedure 3.850? Yes ☒          No ☐

   (a)   If your answer is "yes", then state:

        i.        Date motion filed: Friday, November 05, 2004

        ii.      Whether you received an evidentiary hearing: NO

        iii.     Result: Denied

        iv.     Date of the result: Wednesday, August 09, 2006

(b)     If your Rule 3.850 Motion was denied, then did you file an appeal of that denial with the appropriate Florida District Court of Appeals? Yes ☒ No ☐

        i.        If you failed to appeal the denial of your Rule 3.850 Motion, then explain briefly why:

        ii.      Date appeal filed, result of appeal, and date of result: DATE FILED: OCTOBER 2, 2006 RESULT: AFFIRMED, AND DATE OF RESULT: APRIL 2, 2007

(3)     Have you raised ground two in any other petition, application, or motion filed in the state courts of Florida? Yes ☐ No ☒

If your answer is yes, then give the details, including the date the petition, application, or motion was filed, grounds raised, the court's decision, and the date of said decision for each such petition, application, or motion, whether there was an appeal of each decision, and the result of the appeal:

C.     Ground three: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, Strickland V. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984)

Supporting **FACTS** (tell your story briefly without citing cases or law):

INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON TRIAL COUNSEL'S FAILURE TO OBJECT TO AND PRESERVE PROSECUTORIAL MISCONDUCT.

The Defendant Johnny Emery, alleges that Trial Counsel was ineffective for failing to object to numerous instances of Prosecutorial misconduct throughout his trial. The Prosecutor's egregious conduct includes violations of bolstering the State's witnesses, misquoting State's witnesses, giving personal beliefs regarding defense theories and eliciting sympathy for the victims by misleading the jury into believing the

identity of the victim was that of an law enforcement officer. The cumulative effect of these actions and comments denied the Defendant of a fair trial.

Several times the Prosecutor in Defendant's case improperly bolstered the credibility of the State's witnesses: Brianna Moody... she was truthful with you (T.T. Vol. VII pg. 681, ln. 2-3)... these witnesses, these four witnesses testimony do make sense and they are consistent (T.T. Vol. VII pg. 681, ln. 5-7). Daniel Bryant... so how is that inconsistent with anybody else's statement? It is not. (T.T. Vol. VII pg. 683, ln. 6-7). Misty Combs was involved in a romantic relationship with the Defendant... she had no motivation whatsoever (as to Defense Counsel's theory of conspiring against Defendant) (T.T. Vol. VII pg. 687-88, ln. 9-18). So, what possible motivation at the time... did she have to lie on her lover? (Again Misty Combs) (T.T. Vol. VII pg. 687, ln. 20-22). Mr. Gardner, he has no interest in this case, none whatsoever. (T.T. Vol. VII pg. 695, ln. 11-12). And, the Court Reporter, Vicki Eaves... she had no motivation to lie... (T.T. Vol. VII pg. 697, ln. 6).

The Prosecutor in the Defendant's case also made numerous inappropriate comments toward the theory of the Defendant's Defense. The Prosecutor characterized the Defense as a "Conspiracy Theory", and argued the Defense Theory was a "Big Shaun Conspiracy" (T.T. Vol. IV pg. 689-90, ln. 24-23). A "Big Old Conspiracy" (T.T. Vol. IV ln. 11-13) and witnesses lack of motivation to be part of this conspiracy (T.T. Vol. IV pg. 686-87).

By stating to the jury what was true and untrue, the Prosecutor did the juries job of determining the facts and creditability surrounding the State's witnesses. The Prosecutor also played on the juries' sympathy insinuating that the victim was a "cop" when the victim was not a police official. And, while no one comment in isolation in Defendant's case may be enough to warrant a New Trial. Considering all of the Prosecutor's comments together, does constitute an improper closing argument, sufficient to warrant granting a New Trial. The Prosecutor's comments in Defendant's case were offensive and prejudicial and deprived the Defendant of a fair trial. By failing to object and preserve all of the misconduct of the prosecuting Attorney, Defense Counsel allowed the Prosecutor to have free reign over the courtroom,

thereby denying the Defendant effective representation.

In an era where integrity of the legal profession is constantly called into question, the courts have taken steps to ensure that Attorneys only conduct themselves with the utmost professionalism, when they appear in a courtroom. In order to further these steps, the Prosecutor's action in Defendant's case cannot be condoned. The only way to continue to get the message across that such action will not be tolerated is to require reversal regardless of the facts of the case or the severity of the crime. Any other result will send a message to Prosecutors that these actions are not only tolerated but also promoted because in the end the Prosecutor will have achieved the result he or she sought.

Exhaustion of ground one in the state courts:

(1)     Did you raise ground three in the appropriate Florida District Court of Appeal on a direct appeal of your conviction?          Yes ☐          No ☒

(2)     After your conviction did you raise ground three in the state circuit court that sentenced you by filing a Florida Rule of Criminal Procedure 3.850? Yes ☒          No ☐

    (a)     If your answer is "yes", then state:

        i.       Date motion filed: Friday, November 05, 2004

        ii.      Whether you received an evidentiary hearing: NO

        iii.     Result: Denied

        iv.     Date of the result: Wednesday, August 09, 2006

    (b)     If your Rule 3.850 Motion was denied, then did you file an appeal of that denial with the appropriate Florida District Court of Appeals? Yes ☒ No ☐

        i.       If you failed to appeal the denial of your Rule 3.850 Motion, then explain

briefly why:

        ii.      Date appeal filed, result of appeal, and date of result: DATE FILED:

OCTOBER 2, 2006, RESULT: AFFIRMED, AND DATE OF RESULT: APRIL 2, 2007

(3)     Have you raised ground three in any other petition, application, or motion filed in the state courts of Florida? Yes ☐ No ☒

If your answer is yes, then give the details, including the date the petition, application, or

motion was filed, grounds raised, the court's decision, and the date of said decision for each such petition, application, or motion, whether there was an appeal of each decision, and the result of the appeal:

D.      Ground four: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, Strickland V. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984)

Supporting **FACTS** (tell your story briefly without citing cases or law):

INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON TRIAL COUNSEL'S FAILURE TO OBJECT TO PREJUDICIAL JURY INSTRUCTIONS..

Defendant Emery argues that Counsel was ineffective for not challenging the sufficiency of the Indictment by a Motion to Dismiss or by challenging that the jury instructions constructively amended the Indictment. The Grand Jury in the Defendant's case brought down an Indictment (See Exhibit "J"), charging the Defendant with Attempted Armed Robbery and Murder in the First Degree. The Indictment tracked the wording of the Statutes (Exhibit K & L) in both charges alleged to have been violated. After having been brought to trial, the instructions read to the jury consisted of the additional miscellaneous instruction dealing with principal § 777.011 Fla. Stat. (See Exhibit K, L, M, & N). Defendant Emery was found guilty as charged on both counts of the Indictment.

Defendant Emery now claims that had Counsel challenged the sufficiency of the Indictment or had he challenged the jury instructions prior to the jury hearing them that the trial court would have found that either a mistrial should have been granted or that the principal instruction did not apply to the case. Allowing the jury to hear the principal instruction constructively amended the Indictment and lessened the State's burden of proof.

The standard to determine the constitutionality of a jury instruction, as framed by the U.S. Supreme Court is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that shifts to Defendant the burden of persuasion on an element of the offense

charged. See Boyde v. California, 494 U.S. 370 (1990), and Wilhelm v. State, 568 So.2d 1 (Fla. 1990).

The jury in this Defendant's trial was read the following instructions on First Degree Murder and Attempted Armed Robbery (See Exhibit "O"). The Indictment brought down against the Defendant was not a "joint" Indictment with co-defendant's John Creekmore, Shaun McDaniel, and A.J. Batten, who were all severed from Defendant Johnny Emery prior to trial. Emery was indicted by himself.[2]

Nowhere in the indictment was it alleged that the Defendant aided, abetted, hired or otherwise procured such offense to be committed in violation of Florida Statute § 777.011, although it was alleged that he was the perpetrator of the offense. The entire instruction on principals was read to the jury. (Exhibit M & N). By reading the instruction, the jury could then conclude that if the Defendant was found guilty as a principal to any of the charged offense (here Attempted Armed Robbery and First Degree Murder), then he was automatically guilty of First Degree Murder contrary to the elements of the Indictment. Those implied necessary elements of First Degree Murder that were not present in the statutory language of § 782.04(1) (a) Fla. Stat. must have been included in the Indictment. See U.S. v. Jackson, 72 F.3d 1370 (9th Cir. 1995).

It is well established that "to be valid, an Indictment must allege the Defendant performed acts, which if proven, constituted a violation of the law that he is charged with violating." McNally v. U.S., 483 U.S. 350 (1997). Here, the Defendant was charged with being the actual perpetrator of First Degree Murder and Attempted Armed Robbery. Unfortunately, even the theory that the State presented to the jury was consistent with the elements put forth in the Indictment, what was not consistent was the instructions, and the failure of Defense Counsel to challenge them rendered his assistance ineffective.

It is understood that the precedent law of Jacobs v. State, 184 So.2d 711 (Fla. 1st DCA 1966) and State v. Roby, 246 So.2d 566 (Fla. 1971), may seem to render Defendant's argument Meritless, but Defendant Emery here will show that not only is his case distinguishable from these cases, but also that these cases are in conflict with many recent U.S. Supreme Court decisions.

---

[2] All three co-defendants later entered into a plea agreement

It has become a topic of much debate that every essential element of a crime must be included in an Indictment and presented to a jury to be proven beyond a reasonable doubt. Starting with Almendarez-Torres v. U.S., 523 U.S. 224 (1998, Jones v. U.S., 526 U.S. 227 (1999), Apprendi v. New Jersey, 530 U.S. 46 (2000), and its most recent decision in Blakely v. Washington, ____ U.S. _____ (_____); 17 Fla.L.Weekly Fed S430, (June 24, 2004), the U.S. Supreme Court has solidified its position regarding the necessity of elements being set forth in an Indictment, and a jury deciding the facts which support them.

An essential element of the charges in this case, as set forth in the Indictment is that the Defendant was the actual perpetrator of the crimes. The jury instructions denied the Defendant's right to have all of the elements, set forth by the Statute on felony murder, line 3(b) (Exhibits M & N), the victim could have been killed by a person other than the Defendant, but both the Defendant and the person that killed the victim were principals in the commission of an Attempted Armed Robbery.

Contrary to both the Indictment and the State's Theory, the element of being solely a principal to an attempted armed robbery constituted a conviction as to First Degree Murder. Again, by doing so, the burden then shifts to the Defendant to prove he was not guilty of elements not even charged in the Indictment.

Understanding that common law allows Felony Murder to be included in an Indictment under premeditated murder, the court still cannot allow a jury instruction, which impermissibly shifts the burden of proof as to a valid element of the charge, or instruction confusing and prejudicial. See Espinosa v. State, 476 So.2d 236 (Fla. 3rd DCA 1986). As well, the court is not free to legislate new crimes by extending the meaning of a statute beyond its plain language. See Perkins v. State, 576 So.2d 1310 (Fla. 1991).

Defendant Emery contends that had his Attorney extended the meaning of not only the statutes, but also the Indictment and the theory of the prosecution, as stated before, Defendant argues that his case is distinguishable from Florida Supreme Court holding in Jacobs and the First District Court of Appeals

---

after Emery's conviction.

ruling in Roby. In both of these cases, the Defendants were in question as to their culpability of the crimes alleged mainly due to the State's inability to show what role they played.

In Roby, supra, the Defendant along with several co-defendants shot at and killed the victim, the facts were insufficient to show that the Defendant, Roby's, action directly caused the homicide, but the court found the facts supported a conviction as a principal even though the instruction had not even been given and the trial court refused to give the instruction. The court felt that the lack of giving the instruction rendered Roby's argument Meritless because by the lack of the instruction he could only benefit.

This distinguishing factor, as well as Felony Murder having distinct elements, that also change the burden of proving the Indictment, makes the argument of principal to a separate crime (here Attempted Robbery) three or four steps removed from the actual elements set forth in the Indictment. The State's burden of proof is significantly lessened with each step removed.

In Jacobs, supra, the court stated that it "affirmatively appears without serious dispute that Appellant was charged as a principal in the first degree... " 184 So.2d at 713. The argument was that even he "was not charged with having aided, abetted, counseled, hired, or otherwise procured such offense to be committed... " That he could not be found guilty as such. Although this claim may seem similar, the fact is that Appellant Roby was informed of the charge against him, and the Jacobs decision actually contradicts Florida Supreme Court prior rulings that "were an offense may be committed in various ways, the evidence must establish it to have been committed in the manner charged in the Indictment. The Indictment or Information may have alleged them in the conjunctive and proof of one would have sufficed; but if one of the statements of facts is alleged, it cannot be established by proof of another... " See Long v. State, 92 So.2d 259, 260 (Fla. 1957).

In the instant case, Defendant Emery could not have known that the jury was going to be given on instruction that was totally inconsistent with the charging document. Even taking into consideration that Felony Murder is included under the Pre-med count, the standard instruction, as well as the reading of the

Felony Murder Statute, leads one to believe that the jury must find that the Defendant was a direct participant in either the murder or the crime alleged. By the additional instruction solely helping' a person commit a crime, thereby makes the jury convict the Defendant of Premeditated Murder.

Falling back to the recent U.S. Supreme Court decisions, there has been no question that essential elements must be included in the Indictment. The rationale being that it must be ensured that the Defendant is prosecuted only on the basis of facts presented to the grand jury. The recent surge in concerns as to what elements must be included in an Indictment show that Florida Courts logic is respectfully outdated. Allowing the court's to set standard instructions that negate the necessity of elements from being included in a charging document defeats the purpose of convincing a grand jury to decide what must be proven to convict the Defendant.

Defendant's final allegation is that a "constructive amendment" [of an indictment] occurs when the essential elements of the offense contained in the Indictment are altered to broaden the possible bases for conviction beyond what is contained in the Indictment (quoting United States v. Keller, 916 F.2d 628 (11th Cir 1990). Failure of Counsel to ensure that the Defendant's jury decided his client's guilt or innocence based solely on what was presented in an Indictment and what coincided with statute was below the standard of reasonable and effective assistance of counsel.

Defendant Emery asserts that the errors allowed by his Counsel were fundamental in nature because when a "constructive amendment" occurs it violates a fundamental principal stemming from the Fifth Amendment [of the U.S. Constitution] specifically that a Defendant can only be convicted for a crime charged in the Indictment. (See U.S. v. Keller, supra). Defendant Emery was prejudiced by Counsel's ineffectiveness based on the arguments above and that there is a reasonable probability that had the jury not been subjected to instructions that lessened the burden of the State to prove every element beyond a reasonable doubt, the result of the trial would have been different.

Exhaustion of ground one in the state courts:

(1)     Did you raise ground four in the appropriate Florida District Court of Appeal on a direct appeal of your conviction?          Yes ☐          No ☒

(2)     After your conviction did you raise ground four in the state circuit court that sentenced you by filing a Florida Rule of Criminal Procedure 3.850? Yes ☒      No ☐

    (a)     If your answer is "yes", then state:

        i.      Date motion filed: Friday, November 05, 2004

        ii.     Whether you received an evidentiary hearing: NO

        iii.    Result: Denied

        iv.     Date of the result: Wednesday, August 09, 2006

    (b)     If your Rule 3.850 Motion was denied, then did you file an appeal of that denial with the appropriate Florida District Court of Appeals? Yes ☒ No ☐

        i.      If you failed to appeal the denial of your Rule 3.850 Motion, then explain

briefly why:

        ii.     Date appeal filed, result of appeal, and date of result: DATE FILED:

OCTOBER 2, 2006, RESULT: AFFIRMED, AND DATE OF RESULT: APRIL 2, 2007

(3)     Have you raised ground four in any other petition, application, or motion filed in the state courts of Florida? Yes ☐      No ☒

If your answer is yes, then give the details, including the date the petition, application, or

motion was filed, grounds raised, the court's decision, and the date of said decision for

each such petition, application, or motion, whether there was an appeal of each decision,

and the result of the appeal:

D.     Ground five: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL, Strickland V.

Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984)

Supporting **FACTS** (tell your story briefly without citing cases or law):

DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BASED ON

THE CUMULATIVE ERRORS OF TRIAL COUNSEL

The Defendant contends he was denied effective assistance of Counsel based on the cumulative

effect of the errors raised in the above Grounds 1-4, and the errors presented herein.

## (A) OPENING DOOR TO ADMISSION OF HEARSAY EVIDENCE

During the cross-examination of State's witness, Brianna Moody the Defendant's Attorney recklessly opened the door to hearsay testimony that was damaging, incriminating, and prejudicial. Trial Counsel inquired of Brianna Moody, if it was true that she had heard all of the testimony she testified to from one Shawn McDaniel (T.T. Vol IV pg. 53, ln. 22-24); the State further capitalized on Trial Counsel's examination by later asking Brianna Moody on redirect additional questions regarding the comments of McDaniel's conversation. (T.T. Vol. IV pg. 54). Defense Counsel attempted to rectify his mistake, but the Court admonished him and acknowledged that Counsel did in fact open the door. (T.T. Vol. IV pg. 54, ln. 12). They continued to question Brianna Moody and asked did Shawn McDaniel tell Ms. Moody that someone who shot someone was Johnny Emery? The witness responded in the affirmative and defense counsel, erroneously asked to have the question and answer repeated (T.T. Vol. IV pg. 54-55, ln. 18-22).

During closing argument, the prosecutor expounded on the testimony:

"And you remember that based on Mr. Elers cross-examination that she (Brianna Moody) told you that she was talking to Shawn McDaniel... and Shawn McDaniel was telling her what occurred that evening. That someone had gotten shot and the person that shot him was Johnny Emery." (T.T. Vol. IV pg. 680, ln. 15-19).

The jury was exposed to these prejudicial hearsay statements and it cannot be said that the effect was harmless due to the direct implication that the Defendant, was the shooter. The Defendant's right to effective assistance, a fair trial, and cross-examination under the 5th, 6th, and 14th Amendment to the United States Constitution were violated. And, Counsel's failure here fell below the standard of effective representation and Defendant was prejudiced.

(B) FAILURE TO REQUIRE PROOF OF A CHAIN OF CUSTODY ON THE MURDER WEAPON

Prior to trial, it was known to Defense Counsel that the prosecution intended to present the firearm's used in the commission of the crimes; Counsel failed to investigate the firearm's. Chain of custody of the firearm's and failed to use the inconsistent testimony of Craig Simpkins who alleged to have disposed of the firearm's. All of which would have called into question as to where the firearms were and who handled them.

Craig Simpkins testified that he disposed of both firearms under order of Johnny Emery. He was deposed prior to trial and claimed to have ridden himself of both firearms at one time. Contrary to his sworn deposition, Simpkins later testified at trial that he made two separate trips to dispose of the weapons. Trial Counsel's attempt to impeach Simpkins with his prior inconsistent statement was to no avail. Upon the State entering the actual firearm into evidence Defense Counsel, requested that the State link up the chain of custody to the Sheriffs Office. (T.T. Vol. IV pg. 217, ln. 11-18).

The State responded by refusing to call the witness, necessary to show a line of custody. Eler acquiesced allowing the firearm to be entered without preserving his objection. Allowing the firearm to be entered as evidence and failing to impose upon the State its burden to produce a chain of custody on the firearm fell below the actions of a reasonable Attorney. Counsel allowed this evidence to be entered with no concern for the Defendant's best interest. By allowing the firearm to be entered, Counsel implied to the jury that not only were the firearms legitimately handled, but also that Craig Simpkins was testifying truthfully. The prejudice of the juror's subjection to the actual firearms is two fold. Primarily the jury sees and handles the evidence without question as to how the firearms reached the courtroom. Second, there is then no argument if those firearms were the same firearms Craig Simpkins led law enforcement to.

(C) FAILURE TO ENTER EXCULPATORY EVIDENCE TO PRESERVE FIRST AND LAST CLOSING ARGUMENT

Defendant claims that his Trial Counsel refused to enter into evidence photos, letters, and witness testimony solely to preserve the first and last arguments during closing. Attorney Eler relayed to his client that he felt it was in his client's best interest to refrain from presenting exculpatory evidence so that the defense had an opportunity to argue to the jury twice. Counsel also relayed to Defendant that he felt that any evidence that he would present would have already been brought out to the jury through cross-examination of the State's witness.

Photos were taken by the investigator for the Public Defender's Office when the Public Defender was representing Defendant Emery. The photos depicted injuries that the Defendant sustained from what he claimed was physical abuse by the interrogating officers. That abuse was what the Defendant contested prompted him to agree to visit in exchange for a confession.

Although, argued at a December 20, 2001 Suppression Hearing, the statement was ruled admissible. The jury heard testimony from different officers that stated that the statement was given voluntarily, that the Defendant had no visible injuries before and after the interrogation, and that no visit occurred. Defendant Emery's Counsel never admitted the photos into evidence to bolster the Defendant's testimony, nor did he call Captain Allen Trew or Misty Danielowicz to corroborate his allegations of physical abuse at the hands of the interrogating officers.

By not allowing the jury to see the injuries that the Defendant sustained, Counsel failed to allow the jury to determine the validity of them. Also, the prosecution used his failure to enter the photos to there benefit by bringing the lack of enterance to their attention. Letters were written to the Defendant from co-defendant John Creekmore. In the letters, Creekmore contradicts other witnesses and attempted to show Emery's innocence. Once Emery relinquished the letters to his Attorney, the letters were never heard of again.

Defendant Emery was prejudiced by Elers deficient performance in failing to substantiate the Defendant's theory of defense. It was not Emery's job to come up with support for the defense and it

cannot be claimed that the failure to enter the photos call exculpatory witness, or present letters was trial strategy because it cannot be strategy to do nothing. Defense Counsel in the instant case failed to support his conspiracy defense and refused to enter evidence which would have proved Defendant's innocence. Trial Counsel's performance fell below a standard of reasonableness and resulted in the Defendant being found guilty. Had Trial Counsel called Captain Allen Trew and Misty Danielowicz, entered the photos of Defendant's injuries into evidence, and the letters from John Creekmore there is a reasonable probability that the jury would have returned a verdict of not guilty.

(D) FAILURE TO REQUEST 3RD DEGREE MURDER INSTRUCTIONS

Defendant Emery claims that he was denied effective assistance of counsel when his Trial Counsel failed to request a 3rd Degree Felony Murder jury instruction, where the evidence supported the giving of this permissive lesser-included offense. One of the circumstances that the Defendant testified to during his trial for Attempted Robbery and First Degree Murder was that the incident occurred as a result of words exchanged between the victim and Emery and his co-defendants. The Defendant claims that the victim was shot because of the exchange, not as a result of an attempted robbery.

The elimination of the essential elements found in first-degree felony murder that the murder resulted as a consequence of the Defendant's participation in a numerated felony, allows for the jury to determine. If the murder resulted from an act other than that of a statutorily numerated felony. The jury here was never given the opportunity to weigh if the facts of this case coincided more so with that of the 3rd Degree felony elements.

Trial Counsel's failure to request the instructions fell below the standard effective representation due to the fact that evidence was presented to fit the elements of the lesser offense of third degree murder. The Defendant was prejudiced because the jury was subjected to the primary felony murder instruction and had nothing with which to gauge their decision against. Had Trial Counsel requested an instruction on the offense of Third Degree Murder, there is a reasonable probability that based on the facts of the instant

case the Defendant would have been found guilty of Third Degree Murder.

## (E) FAILURE TO REQUEST CURATIVE INSTRUCTIONS

Counsel for the defense felt it necessary to move for a mistrial based on a question submitted to the Judge during the juries' deliberation. Defendant Emery now claims that Counsel's failure to request a curative instruction and clarify the jury's confusion was ineffective.

Jurors asked the court were are the felony murder charge sheet's?...during deliberations (T.T. Vol. IV pg. 769, ln. 12-23). The court instructed the jury as to the charges of premeditated and felony murder in coming to a verdict.

"They're one in the same. I mean you can convict either way either by premeditation or by Felony Murder... there both First Degree is that what you're talking about." (T.T. Vol. IV pg. 769-770, ln. 24-3).

The jurors then asked were both charges the same and the court answered in the affirmative. Trial Counsel requested a mistrial, once the jury resumed deliberation based on the jury's confusion but failed to request that they be curatively instructed once Counsel's motion for mistrial was denied. Trial Counsel should have based his concerns, as well, on the limited manner in which the jury's confusion was handled. No one in the courtroom was absolutely sure what the jurors were asking and Counsel's failure to interject and request a curative instruction as to the charges of first-degree murder and felony murder fell below the standard of a reasonable Attorney.

Defendant claims that the jury's ignorance of the law and its sometimes-confusing instructions was something that Counsel should have ensured was clarified. Although the Court attempted to explain to the jury what they were asking, Defense Counsel obviously had lingering concerns about the juries confusion. Solely asking for a mistrial did not remedy his concern, nor did it ensure the jury was not still confused.

The Defendant claims the prejudice that resulted from Counsel's failure to request a curative

instruction was that the jury found the Defendant guilty as charged based on a lack of knowledge that could have been cured. There is a probability that had the jury been properly instructed as to the charges and the elements necessary to convict that there verdict may have been different.

(F) FAILURE TO FILE A SUFFICIENT MOTION FOR JUDGMENT OF ACQUITTAL.

The Defendant claims that his Trial Counsel was ineffective for failing to file a sufficient Motion for Judgment of Acquittal at the close of trial. Counsel's failure to present more than a boilerplate motion to the court denied Defendant the opportunity for the court to truly ascertain the prosecutor's failure to meet their burden of guilt. Had Counsel presented a more sufficient motion there is a reasonable probability that the court would have ruled in Defendant's favor.

The prosecution presented the case that the Defendant attempted to rob the victim at gunpoint through testimony of witness who overheard the Defendant make claims of committing the crimes alleged. Defendants contested statement to interrogating officers and a video that depicted masked figures running to and from the crime scene. At no time throughout the trial was the attempted robbery sustained by conclusive, competent evidence to show that any attempt at robbery occurred. The inconsistencies of the prosecutions witnesses and the questions as to the validity of Defendant's statement could have brought to the court's attention the specific shortcomings of the State's case.

In the Defendant's case, the State failed to meet its burden of proving the necessary element of an attempted robbery. The only evidence they entered that even remotely showed a possibility of an attempted robbery was the heavily contested statement that the Defendant allegedly gave. The State went as far as to undermine their own case by entering a video that showed two assailants running to and from the crime scene in a matter of seconds, which was hardly enough time to attempt a robbery. It cannot be said the Defendant was not prejudice by Counsel's lack of assertion during his attempt at a motion for judgment of acquittal. Counsel only requested the following:

"Judge, at this time I would move for a Judgment of Acquittal as to Count I and Count II, Count I being I don't believe the State has presented a prima facie case, sufficient to go to the jury on the issue of First Degree Murder; Either premeditated or Felony Murder. Secondly, because there was no property taken, amongst some other issues, second, as to Count II, I would use that argument as well. (T.T. Vol. IV pg. 529, ln. 3-11).

      Above was the entirety of Counsel's motion. A review of the record can conclusively show that the State's case was spotted with holes and questions. Each witness could have been shown to be discredited. Nowhere was there any solidity as to actually why the victim was approached or shot. Counsel went through the motions at the expense of his client, Johnny Emery. And, the Defendant had a very good likelihood at succeeding had he performed at the level of reasonable and effective assistance that Defendant is Constitutionally Guaranteed.

Exhaustion of ground one in the state courts:

(1)    Did you raise ground five in the appropriate Florida District Court of Appeal on a direct appeal of your conviction?        Yes ☐      No ☒

(2)    After your conviction did you raise ground five in the state circuit court that sentenced you by filing a Florida Rule of Criminal Procedure 3.850? Yes ☒     No ☐

      (a)    If your answer is "yes", then state:

            i.     Date motion filed: Friday, November 05, 2004

            ii.    Whether you received an evidentiary hearing: NO

            iii.   Result: Denied

            iv.   Date of the result: Wednesday, August 09, 2006

      (b)    If your Rule 3.850 Motion was denied, then did you file an appeal of that denial with the appropriate Florida District Court of Appeals? Yes ☒ No ☐

            i.     If you failed to appeal the denial of your Rule 3.850 Motion, then explain

briefly why:

            ii.    Date appeal filed, result of appeal, and date of result: DATE FILED:

OCTOBER 2, 2006, RESULT: AFFIRMED, AND DATE OF RESULT: APRIL 2, 2007

(3)     Have you raised ground five in any other petition, application, or motion filed in the state courts of Florida?  Yes ☐     No ☒

If your answer is yes, then give the details, including the date the petition, application, or

motion was filed, grounds raised, the court's decision, and the date of said decision for

each such petition, application, or motion, whether there was an appeal of each decision,

and the result of the appeal:

D.     Ground Six: PROSECUTORIAL MISCONDUCT—FOURTEENTH

AMENDMENT TO THE UNITED STATES CONSTITUTION

Supporting **FACTS** (tell your story briefly without citing cases or law):

THE TRIAL COURT REVERSIBLY ERRED IN OVERRULING

AND MOTION FOR MISTRIAL WHEN THE PROSECUTOR DURING

CLOSING ARGUMENT, IMPROPERLY COMMENTED UPON DEFENDANT'S

FAILURE TO PRODUCE EVIDENCE. IN SUPPORT OF THIS CLAIM

PETITIONER ADOPTS HEREIN THE FACTS AND LEGAL AUTHORITY

ADVANCED IN PETITIONER'S INITIAL BRIEF ON DIRECT APPEAL

ATTACHED HERETO AS (EXHIBIT P).

Exhaustion of ground one in the state courts:

(1)     Did you raise ground six in the appropriate Florida District Court of Appeal on a direct appeal of your conviction?          Yes ☒          No ☐

(2)     After your conviction did you raise ground six in the state circuit court that sentenced you by filing a Florida Rule of Criminal Procedure 3.850?  Yes ☐  No ☒

(a)     If your answer is "yes", then state:

i.     Date motion filed:

ii.     Whether you received an evidentiary hearing:

iii.     Result:

iv.     Date of the result:

(b)     If your Rule 3.850 Motion was denied, then did you file an appeal of that denial with the appropriate Florida District Court of Appeals? Yes ☐ No ☒

    i.     If you failed to appeal the denial of your Rule 3.850 Motion, then explain

briefly why:

    ii.     Date appeal filed, result of appeal, and date of result:

(3)     Have you raised ground six in any other petition, application, or motion filed in the state courts of Florida? Yes ☐ No ☒

If your answer is yes, then give the details, including the date the petition, application, or

motion was filed, grounds raised, the court's decision, and the date of said decision for

each such petition, application, or motion, whether there was an appeal of each decision,

and the result of the appeal:

15.     Have you previously filed any petitions, applications, or motions with respect to your judgment and conviction in any **federal** court? Yes ☐ No ☒

16.     If your answer to 15 was "yes", give the following information:

(a)     (1)     Name of court:

    (2)     Nature of proceeding and date action filed:

    (3)     Grounds raised:

    (4)     Did you receive an evidentiary hearing on your petition, application, or motion?

        Yes ☐          No ☐

    (5)     Result:

    (6)     Date of result:

(b)     As to any second petition, application, or motion give the same information:

    (1)     Name of court:

    (2)     Nature of proceeding and date action filed:

    (3)     Grounds raised:

      (4)     Did you receive an evidentiary hearing on your petition, application, or motion?

            Yes ☐      No ☐

      (5)     Result:

      (6)     Date of result:

(c)     Did you appeal to the highest court having jurisdiction the result of any action taken on any petition, application, or motion:

      (1)     First petition, etc.     Yes ☐     No ☒
      (2)     Second petition, etc.     Yes ☐     No ☒

(d)     Date appeal filed:

     Result of appeal and date of result:

(e)     If you did not appeal from the adverse action on any petition, application, or motion, explain briefly why you did not:

17.    Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack? Yes ☐    No ☒

18.    If you have previously filed a petition for writ of habeas corpus related to this conviction and sentence in federal court, you must move in the appropriate court of appeal for an order authorizing the federal district court to consider the application. have you filed such a motion? Yes ☐ No ☒

     If your answer to question 18 is yes, provide the following information:

(a)     Name of court where motion filed:

(b)     Date motion filed:

(c)     Result and date of result:

If your answer to question 18 is no, indicate why you failed to do so:

19.    Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a)     At the preliminary hearing:

(b)     At arraignment and plea:

(c)     At trial:

(d)     At sentencing:

(e)     On appeal:

(f)     In any post conviction proceeding:

(g)     On appeal from any adverse ruling in post conviction proceeding:

20.     Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?     Yes ☐          No ☒

21.     Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?          Yes ☐          No ☒

(a)     If so give name and location of court which imposed sentence to be served in the future:


(b)     Date and length of sentence to be served in the future:

(c)     Have you filed, or do you contemplate filing, any petition attacking the judgment which

imposed the sentence to be served in the future?  Yes ☐          No ☐


Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.


# I UNDERSTAND THAT ANY FALSE STATEMENT OR ANSWER TO ANY QUESTIONS IN THIS APPLICATION WILL SUBJECT ME TO THE PENALTIES PERJURY (A FINE OF $250,000 OR IMPRISONMENT FOR FIVE (5) YEARS OR BOTH).

I declare that under penalty of perjury that the foregoing is true and correct.


Executed on: 12/12/07
                        Date


_____
                                    Signature


_____
        Signature of Attorney (If Any)

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

**JOHNNY EMERY,**
**Petitioner,**

**VS.**                                        **CASE NO.: 3:07-cv-440-J-32HTS**

**JAMES McDONOUGH, Secretary-**
**Florida Department of Corrections**

## APPENDIX TO FEDERAL HABEAS CORPUS PETITION

/s/ _____

Johnny Emery, DC# 125075
Walton Correctional Institution
691 Institution Road
DeFuniak Springs, FL 32433

8

## INDEX TO APPENDIX

**Exhibit A** – Deposition excerpt of Captain Allen Trew, August 29, 2000
D. pg. 23, ln. 11, 21-25 and pg. 14, ln. 1-14

**Exhibit B** – Excerpt of December 20, 2001 Suppression Hearing; Testimony of
Defendant Johnny Emery, R.Vol. II pg. 338, ln. 11-25 and pg. 339,
ln. 1-10

**Exhibit C** –Deposition excerpt of Lieutenant Jason Bennett; August 28, 2000
D.pg. 52, ln. 7-13

**Exhibit D** –Excerpt of December 20, 2001 Suppression Hearing; Testimony of
Lieutenant Jason Bennett, R.Vol. II pg. 313, ln. 23-25; pg. 324, ln.
1-25; and pg. 325, ln. 1

**Exhibit E** –Depostion excerpt of Lieutenant Jim Redmond; August 28, 2000
D. pg. 30, ln. 11, 20-25 and pg. 31, ln. 1

**Exhibit F** –Excerpt of December 20, 2001 Suppression Hearing; Testimony of
Lieutenant Jim Redmond, R.Vol. II pg. 281, ln. 5-23

**Exhibit G** –Excerpt of December 20, 2001 Suppression Hearing; Testimony of
Officer Chuck Brannon, R.Vol. II pg. 376-379

**Exhibit H** –Court's continuance of Misti Danielowicz's appearance; Attorney
Eler's intention to call her, R.Vol. II pg. 379-380

**Exhibit I** –Testimony of Misti Danielowicz, January 7, 2002, R.Vol. III
Pg. 385-387

**Exhibit J** –Grand Jury Indictment charging Defendant Johnny Emery
With First Degree murder & Attempted Armed Robbery.

**Exhibit K** –Copy of § 782.04, Florida Statutes-Murder
EXHIBIT L — COPY OF § 812.13(2)(A), FLORIDA STATUES - ATTEMPTED ARMED ROBBERY.
**Exhibit M** –Copy of § 777.011, Florida Statutes-Principal

**Exhibit N** –Jury Instruction on Principal, R.Vol. I p. 120

**Exhibit O** –Jury Instruction on First Degree Murder, Robbery and
Attempt to Commit a Crime, R.Vol. I pg. 118-119 and 129-131

**Exhibit P** –Initial Brief on Direct Appeal.

# *EXHIBIT*

# *A*

13

1    Q    Do you know who actually did the arrest?

2    A    No.  There were three or four Baker County

3    officers there.  I do not know.

4    Q    And you have not yet seen any reports from Baker

5    County?

6    A    No, I have not.

7    Q    But you said before the deposition you were going

8    to try and get those?

9    A    Yes, I will.  I spoke to Lieutenant Brannon this

10   morning to find out if they had -- if any of their men were

11   coming over for depositions today.  And he told me that as

12   far as he knew none had been subpoenaed.  I explained to him

13   that yesterday you mentioned to Lieutenant Bennett that you

14   were interested in the reports.  And I asked Lieutenant

15   Brannon if they had reports that he needed to get them over

16   here.

17   Q    Okay.

18   A    So he assured me he would gather them up.

19   Q    Now, once they had arrested Emery and AJ, did you

20   have contact with either one of them?

×21  A    I had contact with Emery once when I made

22   arrangements for Misti Danielowicz to go back in the cell

23   where he was and speak to him.  It was a very brief

24   conversation and I asked them to keep it to like five

25   minutes.  That was it.

14

1   Q    Was that after he had given a court-reported

2   statement or before?

3   A    I'm not certain, but I believe that he had given

4   the statement then.  But I'm not sure.

5   Q    Did you listen as they spoke to each other?

6   A    No, I did not.

7   Q    Was that conversation monitored in any way?

8   A    No.

9   Q    And did you see any injuries on Johnny Emery when

10  you saw him after his apprehension?

11  A    No.  I never saw any.

12  Q    Do you know whether there was a struggle or fight

13  with Baker County deputies?

X 14  A    I do not know.  Not that I know of.

15  Q    During his interrogation did you listen in?

16  A    No, I did not.

17  Q    Was that monitored in any way with cameras or with

18  a tape recorder or listening device or anything?

19  A.   I'm not certain, but I don't believe it was.  As

20  far as I know it was not monitored in any way.

21  Q    Did you take part in the questioning of Misty

22  Combs?

23  A    No.

24  Q    How about AJ Batten?

25  A    No.

# *EXHIBIT*

# *B*

1    Lieutenant Bennett that is the one that threw you

2    out of the chair?

3        A    Yes, sir.

4        Q    And it's your assertion that the injury

5    depicted in Exhibit B is what was the result of that?

6        A    Yes, sir.

7        Q    Okay.  What happened after that?

8        A    After that happened I was dragged by my

9    arm by Bennett and picked back up and sat back down

10   in the chair.

11          He opened up the door, because the door in

12   Brannon's office they had one door that walked directly

13   into the lobby and they had like a Venetian blind with

14   a window on it, like a small window.  He opened that

15   door and Misty Danielowicz was sitting right outside

16   the door.  He said, Do you see her?

17          I said, Yes, I do.

18          And he shut the door and he said, Well, we

19   might be able to beat your ass all day long and get

20   a statement, what are you going to do when we beat

21   her ass?

22          And that's when he asked me if I could have --

23   I asked him if I can have a visit with her before I

24   took my statement, and I believe it was Captain Allen

25   Trew came back there and made arrangements for me to

1  speak with Misty before my statement.

2      Q    All right.  And physically between you and

3  Redmond and Bennett, was there any other physical stuff

4  going on after that?

5      A    Yeah.  After it got time -- after -- I was

6  supposed to take the statement after -- it was agreed

7  that I would go ahead and take the statement after

8  I was allowed to visit with Misty.  And after I told

9  Misty it was my way of trying to get her out of this,

10  I told her to leave so that way she'd be gone.

11        So then when they got back in Lieutenant

12  Brannon's office I told them I didn't want to take a

13  statement and I was hit in the stomach by Lieutenant

14  Bennett because I didn't want to cooperate.  That's

15  what I was told.  And then from there it went to, when

16  I tried to stand up I was pushed down because I still

17  had handcuffs on.  Lieutenant Bennett put his legs,

18  because my hands were behind my back, over through my

19  arms and lifted up my handcuffs while I was down on the

20  ground and they were telling me that I would have to

21  cooperate because they already made a deal with Misty.

22      Q    Okay.  The injuries depicted in Defense

23  Exhibit C, which is now marked as Defendant's 3, the

24  wrist portion, was that as a result of Lieutenant

25  Bennett --

# *EXHIBIT*

# *C*

1    Q    I'll look through it.  That's all right.

2    A    Like I say, I don't have copies of the

3  sworn statements, so, --

4    Q    Were there any search warrants done in this

5  case?

6    A    No, sir.

7    Q    Was Emery allowed to visit with anybody at

8  the Baker County Sheriff's Office during the time he

9  was giving a statement?  Did he talk to Misti at

10  all?

11    A    He wanted to but, no, sir, he didn't.

12    Q    He didn't?

13    A    No.  He wanted to.

14    Q    Were you a part of any bargain or deal that

15  was made with Cregg Simpkins?  Apparently he came

16  down to the Baker County Sheriff's Office with his

17  parents and a lawyer.

18    A    I never talked to Cregg Simpkins.  I think

19  he came down with Brian Kelly.

20    Q    He did.

21    A    Did he?  Okay.

22    Q    Have you done any work on this case since

23  the -- the last supplement -- at the end of your

24  report, the last supplement was June the --

25    A    6th or something, right?

# *EXHIBIT*

# *D*

1     A    No, sir.

2     Q    Okay.  How many stools were in this office,

3  do you know?

4     A    I don't know.

5     Q    Was the office carpeted?

6     A    I believe it was.

7     Q    Okay.  And where was Lieutenant Redmond when

8  you came in and saw Mr. Emery on the stool?

9     A    He was -- at one time I know he tried to walk

10  out.  You know, he was walking.  But he was sitting

11  at the desk when he handed me this form right here,

12  because I had sit in a chair across from him.

13     Q    Okay.  Was Misti Danielowicz there?

14     A    That day?

15     Q    Uh-huh.

16     A    No, sir.  We talked to her -- I had spoken

17  with her on the first day, which was --

18     Q    May 1st?

19     A    Well, it would have been the night of the

20  30th, May 1st, right, at 00:04 hours.

21     Q    Okay.  So she was not at the police station at

22  Baker County Sheriff's Office?

23     A    She could have been.  I don't know.  I just

24  don't remember her being there.

25     Q    Do you ever remember a time when Mr. Emery

1    was allowed to talk with her either through the hall,

2    or through two opened doors, or anything of that nature

3    during the interview process?

4        A    You talking about Danielowicz?

5        Q    Uh-huh.

6        A    Huh-uh.

7        Q    You know what she looks like?

8        A    I know exactly who you're talking about.

9             There's a Misti Danielowicz and a Misti Combs.

10       Q    Right.

11       A    Okay.

12       Q    Let's talk about Misti Number 1.

13       A    Okay.  Danielowicz, that's the young lady he

14   was living with.

15       Q    Allegedly?

16       A    Allegedly, okay.

17       Q    And I guess my question is, you know what she

18   looks like then?

19       A    Yes, sir.

20       Q    And you knew what she looked like on May 2nd,

21   right?

22       A    Yes, sir.  I can't say I recognized her then.

23       Q    Okay.  She could have been or she could not

24   have been?

25       A    Well, I guess she could have been somewhere.

1    I'm telling you, I don't remember seeing her.

2        Q    Okay.  And just so I understand, Lieutenant

3    Redmond was in the office, Chuck Brannon's office, with

4    Mr. Emery with the door closed until he came out and

5    handed you the rights form; is that right?

6        A    Well, he didn't come outside.  I went in

7    the office.

8        Q    I'm sorry?

9        A    I went in the office.  I went in Lieutenant

10   Brannon's office.

11       Q    Okay.  Let me ask you this --

12       A    And I don't know what time he got there.

13            I can tell you, I walked in at 3:30.

14       Q    Okay.

15       A    Around that time.

16       Q    And I think you said at 4:29 is when the

17   door opened and Lieutenant Redmond came out and said

18   he wanted to tell you the truth, he's admitted to the

19   shooting; is that right?  Didn't you say 4:29?

20       A    No, sir.  I had walked in, I had gone to

21   the bathroom, and then Lieutenant Redmond advised me.

22   I made the notation it was 4:29.

23       Q    Okay.  So initially he was apprehended about

24   2:12 and then --

25       A    I don't know.

# *EXHIBIT*

# *E*

1    A    He was present, yeah.

2    Q    Did anybody else participate in that

3    interview?

4    A    No.

5    Q    When you were in the car reading Emery his

6    rights, was anybody -- any other officer present?

7    A    The officer who would have initialed this,

8    this form here.

9    Q    Okay.  You think that must have been a

10   Baker County officer?

11   A    I believe so.  I'd have to check on that.

12   Q    When you read Emery his rights, did he have

13   any questions about them?

14   A    No.  He understood his rights.

15   Q    Did he ask for a lawyer?

16   A    No.

17   Q    Did he at any time ask to make a phone call

18   or talk to anyone at all?

19   A    No.

20   Q    Was he allowed to talk to anybody after you

21   began to question him?

22   A    He certainly would have been allowed to.  I

23   don't recall him asking to talk to anybody.

24   Q    Did he, in fact, talk to anybody else other

25   than you and Bennett?

1    A    I don't believe so, no.

2    Q    You said that he was crying when you first

3 saw him.  What was his demeanor like as you spoke to

4 him down at the Baker County Sheriff's Office?

5    A    He had settled down quite a bit.

6    Q    Did he cry anymore?

7    A    Yeah, he did, but it was relatively --

8 certainly more infrequent, not as intense.  The best

9 way I can describe it is he had settled down

10 considerably.

11    Q    At any time while you spoke to him did he

12 complain about the way he had been treated by the

13 arresting officers?

14    A    As I recall, he said something to the

15 effect of him -- well, I say him, or them, beating

16 his ass or something to that effect.

17    Q    Did you have any physical contact with him

18 other than when you picked him up under the armpits

19 off the ground out there in the woods?

20    A    No.

21    Q    How about Detective Bennett?

22    A    No.

23    Q    And did you -- while you were in the

24 interview room with him, did you observe at that

25 time any injuries on his body; abrasions, cuts,

# *EXHIBIT*
# *F*

1    Q    Okay.  Was there a window in there with blinds

2  that could be opened or closed?

3    A    I don't believe there is a window in his

4  office.

5    Q    Okay.  Where was Misti Danielowicz?

6    A    I have no idea.

7    Q    It's your testimony that you never talked

8  with Misti Danielowicz on that day or on that occasion;

9  is that right?

10    A    I've never talked to her, sir.

11    Q    Okay.  Do you know what she looks like?

12    A    I wouldn't be able to recognize her, no.

13    Q    Okay.  So then it would be your testimony

14  that Mr. Emery was never allowed to talk with Misti

15  Danielowicz at any point during that interview; is

16  that right?

17    A    To my testimony, I don't know who she is

18  and while he was in my company he was not talking to

19  any other female.

20    Q    Okay.  So if he did, in fact, talk with her

21  either before or after your interview that would have

22  been done without your knowledge?

23    A    Yes.

24    Q    All right.  At the Baker County Sheriff's

25  Office in Chuck Brannon's office you re-read these

# *EXHIBIT*

# *G*

1                    REDIRECT EXAMINATION

2   BY MS. HENTSCHEL:

3       Q    Officer Burnsed, you arrived after Johnny

4   Emery was already in Lieutenant Redmond's car, right?

5       A    Yes, ma'am, I did.

6            MS. HENTSCHEL:  No further questions.

7            THE COURT:  You're free to go.

8                                    [Witness excused]

9            THE COURT:  Any other witnesses?

10           MS. HENTSCHEL:  Just one other briefly, Your

11  Honor.  Chuck Brannon.

12           THE COURT:  Raise your right hand, please.

13                    CHUCK BRANNON,

14  having been produced and first duly sworn as a witness,

15  testified as follows:

16           THE COURT:  Be seated.

17                    DIRECT EXAMINATION

18  BY MS. HENTSCHEL:

19      Q    Could you state your name, for the record.

20      A    Chuck Brannon.

21      Q    And who do you work for?

22      A    Baker County Sheriff's Office.

23      Q    And how long have you been with them?

24      A    About fourteen years.

25      Q    Okay.  Were you asked to assist Clay County

128

1  in the apprehension of a suspect in your county by the

2  name of Johnny Emery?

3      A    Yes.

4      Q    And do you recall back on May 2nd of 2000

5  arriving at a scene where Johnny Emery was being taken

6  down by your emergency response team?

7      A    Yes.

8      Q    Okay.  Can you describe the area where Johnny

9  Emery was taken down?

10     A    It was a wooded area, what I would describe

11 as a woods road, up in the community of Taylor in the

12 northern part of Baker County.

13     Q    Okay.  And do you know how Johnny Emery was

14 arrested or taken down?

15     A    I was not there at the exact moment that he

16 was arrested, but I probably arrived three or four

17 minutes after he was arrested.

18     Q    And where was he when you arrived?

19     A    He was there handcuffed behind his back and

20 standing in the middle of a group of people, and there

21 was the SRT team members and both Sheriff Lancaster

22 and Sheriff Dobson.

23     Q    Do you recall seeing his face at that time?

24     A    Yes.

25     Q    And can you describe it for me?

1      A    He was crying.  He was dirty.  He was sweaty.

2   He looked as if he had been face down in the dirt.

3      Q    Did you notice any scratches or anything

4   on him?

5      A    He could have had some scratches or --

6   scratches is a good word to describe it -- or maybe

7   like a red mark where he had been down on the ground.

8           MS. HENTSCHEL:  All right.  I don't have any

9   other questions of this witness.

10          MR. ELER:  May I approach the witness,

11  Your Honor?

12          THE COURT:  Certainly.

13                   CROSS-EXAMINATION

14  BY MR. ELER:

15     Q    Officer Brannon, let me show you Defendant's

16  Exhibits 1, 2, and 3.

17          Starting off with Number 3, did you notice,

18  when you saw him on that occasion, the abrasions on his

19  right shoulder, specifically which would have been over

20  the shirt he was wearing?  Did you notice that?

21     A    I don't remember that part of his arm being

22  exposed where I could have seen that.

23     Q    Okay.  I'm looking at Number 3 here,

24  specifically that portion of his right wrist behind

25  his back there that appears to be a laceration, do you

1    recall seeing that on him at that time?

2         A    He was handcuffed behind his back.  I don't

3    know that I ever walked around behind him so that I

4    could -- if that's his wrist, I wouldn't have seen his

5    wrist, sir.

6         Q    Okay.  And my last question to you, Officer

7    Brannon, is, do you have any black females that work

8    in the booking department at Baker County Sheriff's

9    Office -- or actually on May 2nd?

10        A    At that time the -- I would imagine there

11   probably are some.  There are some black females

12   employed there.  Now, who -- probably so back then.

13             MR. ELER:  Okay.  Thank you.

14             MS. HENTSCHEL:  No further questions,

15   Your Honor.

16             THE COURT:  Thank you.

17                                    [Witness excused]

18             MS. HENTSCHEL:  That's all I have, Your Honor.

19             THE COURT:  All right.  Now, this witness that

20   you couldn't get, what's her testimony about?

21             MR. ELER:  Judge, we expect her testimony

22   would suggest that she was down at the Baker County

23   Sheriff's Office at the time of Mr. Emery's interview

24   and may have been in contact with Mr. Emery, consistent

25   with his testimony.

# EXHIBIT
# H

1    recall seeing that on him at that time?

2        A    He was handcuffed behind his back.  I don't

3    know that I ever walked around behind him so that I

4    could -- if that's his wrist, I wouldn't have seen his

5    wrist, sir.

6        Q    Okay.  And my last question to you, Officer

7    Brannon, is, do you have any black females that work

8    in the booking department at Baker County Sheriff's

9    Office -- or actually on May 2nd?

10       A    At that time the -- I would imagine there

11   probably are some.  There are some black females

12   employed there.  Now, who -- probably so back then.

13             MR. ELER:  Okay.  Thank you.

14             MS. HENTSCHEL:  No further questions,

15   Your Honor.

16             THE COURT:  Thank you.

17                                   [Witness excused]

18             MS. HENTSCHEL:  That's all I have, Your Honor.

19             THE COURT:  All right.  Now, this witness that

20   you couldn't get, what's her testimony about?

21             MR. ELER:  Judge, we expect her testimony

22   would suggest that she was down at the Baker County

23   Sheriff's Office at the time of Mr. Emery's interview

24   and may have been in contact with Mr. Emery, consistent

25   with his testimony.

131

1    We had a telephone conference through the

2    investigator and she was supposed to meet with him

3    yesterday for purposes of subpoena and was not able to,

4    so -- because I had planned on calling her.  So I'd

5    like to do that.  Her testimony would probably be about

6    fifteen minutes, Judge.

7        And incidentally, Judge, through these

8    officers that just testified from Baker County, which

9    we just took this week, I had planned to file a motion

10   to suppress physical evidence regarding the consent of

11   this witness, who I expect to be here, Ms. Danielowicz,

12   because she's the one who gave consent to his

13   residence, so really it would work out kind of nicely

14   if we could do that on the 3rd briefly, because she's

15   going to be the subject of that consent, so we could

16   sort of kill two birds with one stone if we did it that

17   way, Judge, to save a lot of time.

18       THE COURT:  Well, it may be over in the

19   afternoon before we get to it, so be prepared to do

20   it then, because I'm sure I'll have a large calendar

21   because it'll be just after Christmas.

22       MR. ELER:  Yes, sir.  Thank you.

23       MS. HENTSCHEL:  Thank you, Judge.

24   [Thereupon, the hearing was concluded at 12:45 p.m.]

25                      - - -

380

# *EXHIBIT*

# *I*

**P R O C E E D I N G S**

January 7, 2002                                      8:30 a.m.

- - -

      [Defendant enters courtroom]

      THE COURT:  All right.  Are y'all ready to call that witness?

      MR. ELER:  Judge, she's here.

      I now have had an opportunity to personally chat with her.  It's my intention not to call her as a witness in the hearing, so that would conclude our witnesses, Judge.  But I do have a subpoena for the trial that she was served for and I've admonished her to abide by the subpoena, but I also told her that the Court may want to inquire as to why she was not here Thursday.  But I don't anticipate calling her, Judge.

      MS. HENTSCHEL:  Judge, she's also under my subpoena for trial and I'd like her to understand she needs to be here for that as well.

      THE COURT:  Okay.  Mr. Emery, you understand what your lawyer just said?

      THE DEFENDANT:  Yes, sir.

      THE COURT:  You're in agreement with that, aren't you?

      THE DEFENDANT:  Yes, sir.

      THE COURT:  All right.  Ask her to step

5

1 | in here.

2 | What day was that she was supposed to have

3 | been here?

4 | MR. ELER:  It was a Thursday, the 3rd, Your

5 | Honor, at 9 o'clock.

6 | THE COURT:  Come up here, ma'am.

7 | What is your name?

8 | THE WITNESS:  Misti.

9 | THE COURT:  Misti what?

10 | THE WITNESS:  Danielowicz.

11 | THE COURT:  And you were to be here last

12 | Thursday, I guess, the 3rd to testify, correct?

13 | THE WITNESS:  Yes, sir.

14 | THE COURT:  You have any valid reason why you

15 | weren't here?

16 | THE WITNESS:  I had to go to work.

17 | THE COURT:  You had to what?

18 | THE WITNESS:  I had to go to work.  I have

19 | a son to take care of by myself and I have to pay

20 | my bills.

21 | THE COURT:  Now, you've been subpoenaed for

22 | this trial, correct?

23 | THE WITNESS:  Yes, sir.

24 | THE COURT:  And you understand that this trial

25 | will be today, tomorrow, and Wednesday, right?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  So whatever day that you're

3   expected to be here, you understand you'll be here,

4   right?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Or otherwise a deputy will come

7   pick you up, correct?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  All right.  Thank you.

10                                    [Witness excused]

11         THE COURT:  What about the other two cases,

12  Durden and Andrews?

13         [Court adjourned from these proceedings to

14  handle other cases on the trial calendar]

15         [Defendant re-enters courtroom]

16         THE COURT:  Are y'all ready to proceed?

17         MR. COLLINS:  Yes, sir.

18         THE COURT:  Defense?

19         MR. ELER:  Yes, sir.

20         THE COURT:  Bring them in.

21         [The prospective jury panel entered the

22  courtroom, and the following further proceedings were

23  had in their presence:]

24         THE COURT:  All right.  Good morning, ladies

25  and gentlemen.  My name is William Wilkes and I'm one

# EXHIBIT
# J

) 11-2

STATE ATTORNEY NO.:      00-403568

CASE NO.:      00-521-CF
DIVISION:      CR-A

Book: **1894**
Page: **0676**
Rec: 10/25/2000
      ·03:05 PM
File# 200044638
  James B. Jett
Clerk Of Courts
Clay County, FL

**5 MIN. RETURN**

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR CLAY COUNTY,
FALL TERM, IN THE YEAR TWO THOUSAND

STATE OF FLORIDA

INDICTMENT FOR:

vs.

JOHNNY EMERY

MURDER IN THE FIRST DEGREE and
ATTEMPTED ARMED ROBBERY

---------------------------------------------------

IN THE NAME OF AND BY THE AUTHORITY OF THE STATE OF FLORIDA:

The Grand Jurors of the State of Florida and County of Clay, empaneled and sworn to inquire and true presentment make in and for the body of the County of Clay, upon their oaths, do present and charge that JOHNNY EMERY, on the 28th day of April, 2000, in the County of Clay and the State of Florida, unlawfully and from a premeditated design to effect the death of Richard Alexander Campbell, did then and there kill the said Richard Alexander Campbell, a human being, by shooting him and during the commission of the aforementioned Murder in the First Degree the said JOHNNY EMERY carried or had in his possession a firearm, to-wit: a pistol, and during the commission of the aforementioned Murder in the First Degree the said JOHNNY EMERY did discharge a firearm and as a result of the discharge, death was inflicted upon a person, contrary to the provisions of Section(s) 782.04(1)(a) and 775.087, Florida Statutes.

<u>SECOND COUNT</u>

The Grand Jurors of the State of Florida and County of Clay, empaneled and sworn to inquire and true presentment make in and for the body of the County of Clay, upon their oaths, do present and charge that JOHNNY EMERY on the 28th day of April, 2000, in the County of Clay and the State of Florida, did unlawfully by force, violence, assault, or putting in fear, attempt to take money or other property, to-wit: U.S. Currency, the property of Richard Alexander Campbell, as owner or custodian, from the person or custody of Richard Alexander Campbell, and during the commission of the aforementioned robbery the said JOHNNY EMERY did discharge a firearm and as a result of the discharge, death was inflicted upon a person, contrary to the provisions of Sections 812.13(2)(a), 777.04 and 775.087, Florida Statutes.

*Luther B. Smith*
Foreperson of the Clay County Grand Jury

RECEIVED
JAMES B. JETT
00 OCT 25 PH 2: 18
Clerk of Court
Clay County, FL

*T  R. Ch*
Timothy R. Collins
Bar Number: 344141
Assistant State Attorney
Fourth Judicial Circuit in and for Clay
County, Florida,
Prosecuting for said State

**THIS INSTRUMENT IN THE COMPUTER**

OCT 2 5 2000   **RK**

JAMES B. JETT
CLERK COUNTY COURT
CLAY COUNTY, FLORIDA

00-0048

OR BOOK 1894 PAGE 0577

I, Timothy R. Collins, Assistant State Attorney for the Fourth Judicial Circuit of Florida, in and for Clay County, hereby certify that I, as such Prosecuting Officer and as authorized and required by law, have advised the Grand Jury which returned this Indictment this 25ᵗʰ day of October, 2000.

Timothy R. Collins
Bar Number: 344141
Assistant State Attorney

Race:  White          Sex:  Male          DOB:  4/18/78                    SSN:   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

TRC/pg

Custody: _____ Yes    _____ No       Bond  $_____              _____ None

Capias:  _____ (If not in custody)      Arraignment Date    _____

Juvenile: _____ Yes   _____ No         Sealed _____ Yes    _____ No

Receiving Judge: _____

MCL NO:    S782.04(1)(A); S775.087(2)A)3; S777.04(1), S812.13(2)(A), F2

OR BOOK 1894 PAGE 0678

### CASE NO. __00-521-CF__

## IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL
## CIRCUIT OF THE STATE OF FLORIDA, IN AND FOR
__CLAY__ COUNTY, __FALL__ TERM~~XX~~2000.

---

### THE STATE OF FLORIDA

#### vs.

JOHNNY EMERY

---

### INDICTMENT FOR

MURDER IN THE FIRST DEGREE and
ATTEMPTEM ARMED ROBBERY

---

### A TRUE BILL

*Luther N. Smith*

__Foreperson of the Grand Jury__

---

### WITNESS FOR THE STATE

LT. JASON BENNETT

---

**Presented in open Court by the Grand Jury and filed**
**this _25TH_ day of _OCTOBER_ , ~~19~~ 2000.**

JAMES B. JETT
**Clerk Circuit Court**

By *J. Robert King*
**Deputy Clerk**

### HARRY L. SHORSTEIN
### STATE ATTORNEY

# EXHIBIT
# K

rule," which provides a conclusive presumption that an injury is not the cause of death or that whether it is the cause cannot be discerned if the interval between the infliction of the injury and the victim's death exceeds a year and a day, is hereby abrogated and does not apply in this state.

**Derivation:**

Laws 1988, c. 88–39, § 1.

Laws 1988, c. 88–39, § 2, eff. May 18, 1988, provides:

"This act applies to any prosecution for homicide caused by an injury inflicted on or after the effective date of this act [May 18, 1988]."

## 782.04.  Murder

(1)(a)  The unlawful killing of a human being:

1.  When perpetrated from a premeditated design to effect the death of the person killed or any human being;

2.  When committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any:

a.  Trafficking offense prohibited by s. 893.135(1),

b.  Arson,

c.  Sexual battery,

d.  Robbery,

e.  Burglary,

f.  Kidnapping,

g.  Escape,

h.  Aggravated child abuse,

i.  Aggravated abuse of an elderly person or disabled adult,

j.  Aircraft piracy,

k.  Unlawful throwing, placing, or discharging of a destructive device or bomb,

l.  Carjacking,

m.  Home-invasion robbery,

n.  Aggravated stalking,

o.  Murder of another human being; or

3.  Which resulted from the unlawful distribution of any substance controlled under s. 893.03(1), cocaine as described in s. 893.03(2)(a)4., or opium or any synthetic or natural salt, compound, derivative, or preparation of opium by a person 18 years of age or older, when such drug is proven to be the proximate cause of the death of the user,

is murder in the first degree and constitutes a capital felony, punishable as provided in s. 775.082.

(b)  In all cases under this section, the procedure set forth in s. 921.141 shall be followed in order to determine sentence of death or life imprisonment.

(2)  The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree and constitutes a felony of the first degree, punishable by imprisonment for a term of years

not exceeding life or as provided in s. 775.082, s. 775.083, or s. 775.084.

(3)  When a person is killed in the perpetration of, or in the attempt to perpetrate, any:

(a)  Trafficking offense prohibited by s. 893.135(1),

(b)  Arson,

(c)  Sexual battery,

(d)  Robbery,

(e)  Burglary,

(f)  Kidnapping,

(g)  Escape,

(h)  Aggravated child abuse,

(i)  Aggravated abuse of an elderly person or disabled adult,

(j)  Aircraft piracy,

(k)  Unlawful throwing, placing, or discharging of a destructive device or bomb,

(l)  Carjacking,

(m)  Home-invasion robbery,

(n)  Aggravated stalking, or

(o)  Murder of another human being,

by a person other than the person engaged in the perpetration of or in the attempt to perpetrate such felony, the person perpetrating or attempting to perpetrate such felony is guilty of murder in the second degree, which constitutes a felony of the first degree, punishable by imprisonment for a term of years not exceeding life or as provided in s. 775.082, s. 775.083, or s. 775.084.

(4)  The unlawful killing of a human being, when perpetrated without any design to effect death, by a person engaged in the perpetration of, or in the attempt to perpetrate, any felony other than any:

(a)  Trafficking offense prohibited by s. 893.135(1), is murder in the third degree and constitutes a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b)  Arson,

(c)  Sexual battery,

(d)  Robbery,

(e)  Burglary,

(f)  Kidnapping,

(g)  Escape,

(h)  Aggravated child abuse,

(i)  Aggravated abuse of an elderly person or disabled adult,

(j)  Aircraft piracy,

(k)  Unlawful throwing, placing, or discharging of a destructive device or bomb,

(l)  Unlawful distribution of any substance controlled under s. 893.03(1), cocaine as described in s. 893.03(2)(a)4., or opium or any synthetic or natural salt, compound, derivative, or preparation of opium by a person 18 years of age or older, when such drug is

proven to be the proximate cause of the death of the user,

(m) Carjacking,

(n) Home-invasion robbery,

(o) Aggravated stalking, or

(p) Murder of another human being,

is murder in the third degree and constitutes a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. *Amended by Laws 1993, c. 93–212, § 3, eff. July 1, 1993; Laws 1995, c. 95–195, § 11, eff. July 1, 1995; Laws 1996, c. 96–322, § 18, eff. Oct. 1, 1996; Laws 1998, c. 98–417, § 1, eff. Oct. 1, 1998; Laws 1999, c. 99–188, § 10, eff. July 1, 1999.*

**Derivation:**

Laws 1990, c. 90–112, § 4.
Laws 1989, c. 89–281, §§ 2, 4.
Laws 1987, c. 87–243, § 6.
Laws 1984, c. 84–16, § 1.
Laws 1982, c. 82–69, § 1.
Laws 1982, c. 82–4, § 1.
Laws 1979, c. 79–400, § 290.
Laws 1976, c. 76–141, § 1.
Laws 1975, c. 75–298, § 6.
Laws 1974, c. 74–383, § 14.
Laws 1972, c. 72–724, § 3.
Laws 1971, c. 71–136, § 712.
Laws 1953, c. 28023, § 1.
Comp.Gen.Laws 1927, § 7137.
Laws 1921, c. 8470, § 1.
Rev.Gen.St.1920, § 5035.
Gen.St.1906, § 3205.
Rev.St.1892, § 2380.
Laws 1868, c. 1637, subc. 3, § 2.

**Cross References**

Discharging destructive devices, see §§ 790.16, 790.161.
Lesser included offense plea, vehicular homicide, mandatory adjudication, see § 316.656.

## 782.051. Attempted felony murder

(1) Any person who perpetrates or attempts to perpetrate any felony enumerated in s. 782.04(3) and who commits, aids, or abets an intentional act that is not an essential element of the felony and that could, but does not, cause the death of another commits a felony of the first degree, punishable by imprisonment for a term of years not exceeding life, or as provided in s. 775.082, s. 775.083, or s. 775.084, which is an offense ranked in level 9 of the Criminal Punishment Code. Victim injury points shall be scored under this subsection.

(2) Any person who perpetrates or attempts to perpetrate any felony other than a felony enumerated in s. 782.04(3) and who commits, aids, or abets an intentional act that is not an essential element of the felony and that could, but does not, cause the death of another commits a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, which is an offense ranked in level 8 of the Criminal Punishment Code. Victim injury points shall be scored under this subsection.

(3) When a person is injured during the perpetration of or the attempt to perpetrate any felony enumerated in s. 782.04(3) by a person other than the person engaged in the perpetration of or the attempt to perpetrate such felony, the person perpetrating or attempting to perpetrate such felony commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, which is an offense ranked in level 7 of the Criminal Punishment Code. Victim injury points shall be scored under this subsection. *Added by Laws 1996, c. 96–359, § 1, eff. Oct. 1, 1996. Amended by Laws 1997, c. 97–194, § 18, eff. Oct. 1, 1998; Laws 1998, c. 98–204, § 12, eff. Oct. 1, 1998.*

## 782.07. Manslaughter; aggravated manslaughter of an elderly person or disabled adult; aggravated manslaughter of a child

(1) The killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable homicide or murder, according to the provisions of this chapter, is manslaughter, a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(2) A person who causes the death of any elderly person or disabled adult by culpable negligence under s. 825.102(3) commits aggravated manslaughter of an elderly person or disabled adult, a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(3) A person who causes the death of any person under the age of 18 by culpable negligence under s. 827.03(3) commits aggravated manslaughter of a child, a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. *Amended by Laws 1996, c. 96–322, § 12, eff. Oct. 1, 1996.*

**Derivation:**

Laws 1975, c. 75–298, § 6.
Laws 1974, c. 74–383, § 15.
Laws 1973, c. 73–333, § 180.
Laws 1971, c. 71–136, § 715.
Comp.Gen.Laws 1927, § 7141.
Rev.Gen.St.1920, § 5039.
Gen.St.1906, § 3209.
Rev.St.1892, § 2384.

**Cross References**

Driving under the influence, see § 316.193.
Manslaughter resulting from motor vehicle operation or vehicular homicide, mandatory adjudication, plea of lesser included offense, see § 316.656.

## 782.071. Vehicular homicide

"Vehicular homicide" is the killing of a human being, or the killing of a viable fetus by any injury to the mother, caused by the operation of a motor vehicle by another in a reckless manner likely to cause the death of, or great bodily harm to, another. Vehicular homicide is:

(1) A felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

# *EXHIBIT*

# *L*

**2.081**

**.81.  Trade secrets; theft, embezzlement; un-**
**ul copying; definitions; penalty**

As used in this section:

"Article" means any object, device, machine,
al, substance, or composition of matter, or any
e or copy thereof, whether in whole or in part,
ng any complete or partial writing, record, re-
g, drawing, sample, specimen, prototype model,
graph, microorganism, blueprint, map, or copy
f.

"Representing" means completely or partially
bing, depicting, embodying, containing, constitut-
flecting, or recording.

"Trade secret" means the whole or any portion
se of any formula, pattern, device, combination
ices, or compilation of information which is for
r is used, in the operation of a business and
provides the business an advantage, or an oppor-
to obtain an advantage, over those who do not
or use it. "Trade secret" includes any scientific,
cal, or commercial information, including any
, process, procedure, list of suppliers, list of
ers, business code, or improvement thereof. Ir-
ctive of novelty, invention, patentability, the state
e prior art, and the level of skill in the business,
r field to which the subject matter pertains, a
secret is considered to be:

Secret;

Of value;

For use or in use by the business; and

Of advantage to the business, or providing an
tunity to obtain an advantage, over those who do
now or use it

the owner thereof takes measures to prevent it
becoming available to persons other than those
ted by the owner to have access thereto for limited
ses.

"Copy" means any facsimile, replica, photo-
, or other reproduction in whole or in part of an
e and any note, drawing, or sketch made of or
an article or part or portion thereof.

Any person who, with intent to deprive or with-
from the owner thereof the control of a trade
t, or with an intent to appropriate a trade secret
s or her own use or to the use of another, steals or
ezzles an article representing a trade secret or
put authority makes or causes to be made a copy
a article representing a trade secret is guilty of a
y of the third degree, punishable as provided in s.
82 or s. 775.083.

In a prosecution for a violation of the provisions
his section, it is no defense that the person so
ged returned or intended to return the article so
n, embezzled, or copied. *Amended by Laws 1997,*
*-102, § 1240, eff. July 1, 1997.*

**Derivation:**
Laws 1985, c. 85-34, § 1.
Laws 1974, c. 74-136, §§ 1 to 3.

## 812.13.  Robbery

(1) "Robbery" means the taking of money or other
property which may be the subject of larceny from the
person or custody of another, with intent to either
permanently or temporarily deprive the person or the
owner of the money or other property, when in the
course of the taking there is the use of force, violence,
assault, or putting in fear.

(2)(a)  If in the course of committing the robbery the
offender carried a firearm or other deadly weapon,
then the robbery is a felony of the first degree, punish-
able by imprisonment for a term of years not exceeding
life imprisonment or as provided in s. 775.082, s.
775.083, or s. 775.084.

(b)  If in the course of committing the robbery the
offender carried a weapon, then the robbery is a felony
of the first degree, punishable as provided in s.
775.082, s. 775.083, or s. 775.084.

(c)  If in the course of committing the robbery the
offender carried no firearm, deadly weapon, or other
weapon, then the robbery is a felony of the second
degree, punishable as provided in s. 775.082, s. 775.083,
or s. 775.084.

(3)(a)  An act shall be deemed "in the course of
committing the robbery" if it occurs in an attempt to
commit robbery or in flight after the attempt or com-
mission.

(b)  An act shall be deemed "in the course of the
taking" if it occurs either prior to, contemporaneous
with, or subsequent to the taking of the property and if
it and the act of taking constitute a continuous series
of acts or events.

**Derivation:**
Laws 1992, c. 92-155, § 1.
Laws 1987, c. 87-315, § 1.
Laws 1975, c. 75-298, § 29.
Laws 1974, c. 74-383, § 38.
Fla.St. 1973, § 813.011.
Laws 1971, c. 71-136, § 839.
Laws 1955, c. 29930, § 1.
Laws 1953, c. 28217, § 1.

## 812.131.  Robbery by sudden snatching

(1) "Robbery by sudden snatching" means the tak-
ing of money or other property from the victim's
person, with intent to permanently or temporarily de-
prive the victim or the owner of the money or other
property, when, in the course of the taking, the victim
was or became aware of the taking.  In order to satisfy
this definition, it is not necessary to show that:

(a)  The offender used any amount of force beyond
that effort necessary to obtain possession of the money
or other property; or

(b)  There was any resistance offered by the victim
to the offender or that there was injury to the victim's
person.

# EXHIBIT
# M

777.011 PRINCIPAL IN FIRST DEGREE. — WHOEVER COMMITS ANY CRIMINAL OFFENSE AGAINST THE STATE, WHETHER FELONY OR MISDEMEANOR, OR AIDS, ABETS, COUNSELS, HIRES, OR OTHERWISE PROCURES SUCH OFFENSE TO BE COMMITTED, AND SUCH OFFENSE IS COMMITTED OR IS ATTEMPTED TO BE COMMITTED, IS A PRINCIPAL IN THE FIRST DEGREE AND MAY BE CHARGED, CONVICTED, AND PUNISHED AS SUCH, WHETHER HE OR SHE IS OR IS NOT ACTUALLY OR CONSTRUCTIVELY PRESENT AT THE COMMISSION OF SUCH OFFENSE.

# EXHIBIT

# N

## PRINCIPALS

If the defendant helped another person or persons attempt to commit a crime, the defendant is a principal and must be treated as if he had done all of the things the other person or persons did if:

1. The defendant had a conscious intent that the criminal act be done; and

2. The defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually attempt to commit the crime.

To be a principal, the defendant does not have to be present when the crime is committed or attempted.

00403568.JI /arc

000 0120

# EXHIBIT

# O

## MURDER IN THE FIRST DEGREE

There are two ways in which a person may be convicted of First Degree Murder.  One is known as Premeditated Murder and the other is known as Felony Murder.

Before you can find the defendant guilty of First Degree Premeditated Murder, the State must prove the following three elements beyond a reasonable doubt:

1.     Richard Alexander Campbell is dead.

2.     The death was caused by the criminal act of JOHNNY EMERY.

3.     There was a premeditated killing of Richard Alexander Campbell.

An "act" includes a series of related actions arising from and performed pursuant to a single design or purpose.

"Killing with Premeditation" is killing after consciously deciding to do so.  The decision must be present in the mind at the time of the killing.  The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the killing.  The period of time must be long enough to allow reflection by the defendant.  The premeditated intent to kill must be formed before the killing.

The question of premeditation is a question of fact to be determined by you from the evidence. It will be sufficient proof of premeditation if the circumstances of the killing and the conduct of the accused convince you beyond a reasonable doubt of the existence of premeditation at time of the killing.

0118

00403568.JI /arc

Before you can find the defendant guilty of First Degree Felony Murder, the State must prove the following three elements beyond a reasonable doubt:

1.    Richard Alexander Campbell is dead.

2.    The death occurred as a consequence of and while JOHNNY EMERY was attempting to commit Armed Robbery.

3.    a.    JOHNNY EMERY was the person who actually killed Richard Alexander Campbell.

OR

b.    Richard Alexander Campbell was killed by a person other than JOHNNY EMERY but both JOHNNY EMERY and the person who killed Richard Alexander Campbell were principals in the commission of Attempted Armed Robbery.

In order to convict of First Degree Felony Murder, it is not necessary for the State to prove that the defendant had a premeditated design or intent to kill.

I will later define the crime of Attempted Armed Robbery as it pertains to the charge of First Degree Felony Murder.

## ROBBERY

I will now define for you the crime of Attempted Armed Robbery.

Before you can find the defendant guilty of Robbery, the State must prove the following four elements beyond a reasonable doubt:

1.   JOHNNY EMERY took the money from the person or custody of Richard Alexander Campbell.

2.   Force, violence, assault, or putting in fear was used in the course of the taking.

3.   The property taken was of some value.

4.   The taking was with the intent to permanently or temporarily deprive Richard Alexander Campbell of his right to the property or any benefit from it.

"In the course of the taking" means that the act occurred prior to, contemporaneous with, or subsequent to the taking of the property and that the act and the taking of the property constitute continuous series of acts or events.

In order for a taking of property to be robbery, it is not necessary that the person robbed be the actual owner of the property. It is sufficient if the victim has the custody of the property at the time of the offense.

The taking must be by the use of force or violence or by assault so as to overcome the resistance of the victim, or by putting the victim in fear so that the victim does not resist. The law does not require that the victim of robbery resist to any particular extent or that the victim offer any actual physical resistance if the circumstances are such that the victim is placed in fear of death or great bodily harm if he or she does resist. But unless prevented by fear there must be some resistance to make the taking one done by force or violence.

In order for a taking by force, violence or putting in fear to be robbery, it is not necessary that the taking be from the person of the victim. It is sufficient if the property taken is under the actual control of the victim so that it cannot be taken without the use of force, violence or intimidation directed against the victim.

0129

)                                              )

The punishment provided by law for the crime of robbery is greater if "in the course of committing the robbery" the defendant carried some kind of weapon. An act is "in the course of committing the robbery" if it occurs in an attempt to commit robbery or in flight after the attempt or commission. Therefore, if you find the defendant guilty of robbery, you must then consider whether the State has further proved those aggravating circumstances and reflect this in your verdict.

If you find that the defendant carried a firearm in the course of committing the robbery, you should find him guilty of robbery with a firearm.

If you find that the defendant carried a deadly weapon in the course of committing the robbery, you should find him guilty of robbery with a deadly weapon.

If you find that the defendant carried a weapon that was not a firearm or deadly weapon in the course of committing the robbery, you should find him guilty of robbery with a weapon.

If you find that the defendant carried no firearm or weapon in the course of committing the robbery, but did commit the robbery, you should find him guilty only of robbery.

I have previously defined the term "firearm" as it relates to these instructions.

A weapon is a "deadly weapon" if it is used or threatened to be used in a way likely to produce death or great bodily harm.

A "weapon" is legally defined to mean any object that could be used to cause death or inflict serious bodily harm.

00130

)                                            )

## ATTEMPT TO COMMIT CRIME

Before you can find the Defendant guilty of an Attempt to Commit Armed Robbery, the State must prove the following two elements beyond a reasonable doubt:

1.    JOHNNY EMERY did some act toward committing the crime of Armed Robbery that went beyond just thinking or talking about it.

2.    He would have committed the crime except that

   a.    someone prevented him from committing the crime of Armed Robbery.

                              OR

   b.    he failed.

0131

# EXHIBIT
# P

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . .   i

TABLE OF CITATIONS . . . . . . . . . . . . . . . . .  ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . .   1

STATEMENT OF THE CASE AND FACTS . . . . . . . . . .   2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . .  10

ARGUMENT

     I.   THE TRIAL COURT REVERSIBLY ERRED IN OVER-
         RULING APPELLANT'S OBJECTION AND MOTION FOR
         MISTRIAL WHEN THE PROSECUTOR, DURING CLOSING
         ARGUMENT, IMPROPERLY COMMENTED UPON APPELLANT'S
         FAILURE TO PRODUCE EVIDENCE IN CONTRAVENTION
         TO THE FOURTEENTH AMENDMENT TO THE UNITED
         STATES CONSTITUTION.  . . . . . . . . . . . .  11

         Standard of Review  . . . . . . . . .  fn.1, p. 12

CONCLUSION  . . . . . . . . . . . . . . . . . . . .  17

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . .  17

CERTIFICATE OF FONT SIZE  . . . . . . . . . . . . .  17

## TABLE OF CITATIONS

**CASES**                                                              **PAGE(S)**

DiGuilio v. State, 491 So. 2d 1149 (Fla. 1986) . . . . . . 12

Goodwin v. State, 751 So. 2d 537 (Fla. 2000) . . . . . . . 12

Gutierrez v. State, 798 So. 2d 893 (Fla. 4th DCA 2001). . 15

Jackson v. State, 690 So. 2d 714 (Fla. 4th DCA 1997) . 13,14

Jackson v. State, 575 So. 2d 181 (Fla. 1991). . . . 11,12,13

Miranda v. Arizona,
    384 U.S. 436, 86 S. Ct. 1602,
    16 L. Ed. 2d 694 (1966) . . . . . . . . . . . . . . 2,3

Rodriguez v. State, 753 s0.2d 29 (Fla. 2000) . . . . . . 13

White v. State, 757 So. 2d 542 (Fla. 4th DCA 2000) . . 14,15


**CONSTITUTIONS AND STATUTES**

United States Constitution
    Amendment XIV . . . . . . . . . . . . . . . . . . . 11


**OTHER SOURCES**

Florida Rules of Appellate Procedure
    Rule 9.210(a)(2) . . . . . . . . . . . . . . . . . 17

Florida Standard Jury Instructions (Criminal Cases) . . . 13

IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT OF FLORIDA

**JOHNNY EMERY,**

    Appellant,

v.                     Case No.  **1D02-669**

STATE OF FLORIDA,

    Appellee.

_____/

## INITIAL BRIEF OF APPELLANT

### PRELIMINARY STATEMENT

Johnny Emery was the defendant below and will be referred to hin this brief as "defendant," "appellant," or by his proper name.

The record on appeal consists of seven volumes which will be referred to with volume number in roman numerals followed by page number, both in parentheses.

-1-

## STATEMENT OF THE CASE AND FACTS

Appellant was indicted for first-degree murder and attempted armed robbery. (I-48-50).

Pretrial, appellant filed a Motion to Suppress Statements, Admissions and Confessions. (I-87-89). The motion was denied. (I-99-103). A hearing on the motion to suppress was held December 20, 2001. (II-250).

Lieutenant Jimm Redmond testified that on May 2, 2000, he read appellant his <u>Miranda</u> rights after he had been taken into custody. (II-259). Appellant agreed to speak with him at that time. (II-261). Appellant was transported to the Baker County Sheriff's Office where he was re-advised of his rights. Appellant signed the form at 3:08 p.m. (II-263-266). Initially, appellant indicated that he was being set up. Around 4:23 p.m., appellant began to ask questions about an attorney. (II-268). When he asked if there was a penalty for asking for an attorney, Redmond told him no, there was not. Redmond told him he was entitled to an attorney and reread him <u>Miranda</u>. Appellant asked additional questions about an attorney: If there was a penalty; and what would happen if he asked for one. Redmond told him "certainly I wouldn't ask him any further questions; that he was entitled to one." Appellant also asked if he could not afford one would one be appointed for him. Redmond told him he would insure he had an attorney if he asked for one. Redmond then asked "are you asking for an attorney? Do you

-2-

want an attorney?" Appellant replied no. Redmond then re-read him Miranda. (II-268-269).

After Lieutenant Bennett left the room, appellant admitted the shooting. (II-269-270). Lieutenant Redmond called Bennett back into the room. They contacted a court reporter so that a sworn statement could be taken. (II-270).

When the court reporter arrived, Miranda rights were re-read. (II-272). A sworn statement was taken. (II-273-274).

Lieutenant Bennett testified he first contacted appellant on May 2, 2000, around 3:30 p.m. in Lieutenant Brannon's office at the Baker County Sheriff's Office. (II-299-301). Lieutenant Redmond advised that appellant had already been read his Miranda rights and had signed the form. (II-301). Lieutenant Bennett did not ask appellant whether he had agreed to waive his rights. (II-303). Lieutenant Bennett escorted appellant to the bathroom at 1623 hours. (II-305). Around that time, appellant made several inquiries of Lieutenant Redmond. Appellant asked if there was a penalty for asking for an attorney. Lieutenant Redmond said there was none. Appellant asked what would happen if he asked for an attorney. Lieutenant Redmond advised that "we would end the interview with him." Appellant asked if he would have to pay for an attorney, Lieutenant Redmond advised him that "I'm going to read you Miranda again so you'll understand." At that point, they took the bathroom break. Lieutenant Bennett then left the room himself.

-3-

When he returned a few minutes later Lieutenant Redmond advised that appellant had admitted the shooting.  (II-308).

Appellant testified that before the statement he requested a lawyer.  (II-335).  Bennett flipped over the chair appellant was seated in, dumping him on the floor, saying "this is what happens when you ask for a fucking lawyer."  (II-335).  Appellant indicated that the injuries depicted in Exhibit B were the result of this action.  (II-338).

Officer Deese, the transporting officer, indicated that appellant did not indicate that he had been beat up by the officers.  (II-370).

Investigator Burnsed witnessed Lieutenant Redmond advising appellant of his rights.  (II-373-375).

The motion to suppress was denied.  (I-99-103).

Briana Moody testified that in the early morning hours of April 28, 2000, Shawn McDaniels, A. J., John Creekmore, and appellant drove up to their trailer.  When they got out of the truck, appellant stated "Did you see that m...fer hit the ground?" (IV-40).  Later, she saw a black gun lying on the bed in appellant and Misty's room.  (IV-43).

On cross-examination, Ms. Moody identified a handwritten statement she had prepared.  (IV-53).  She acknowledged that the information in the statement she had received from Shawn McDaniels. Over appellant's hearsay objection, on redirect, Ms. Moody was

-4-

allowed to testify that McDaniels told her that appellant shot someone. (IV-54-55).

Over objection, Sandra Bryant testified that appellant stated "When I seen the blood splatter that I just want to go out and do it again." (IV-66). She testified that she saw appellant pull a black gun from his waistband. (IV-67).

Daniel Bryant testified that appellant stated "They went up to a guy, he said he was a cop, and he shot him in the head and watched the blood spill." Bryant said appellant said he wanted to go do it again. (IV-82-83).

Travis Carter testified that in the early morning hours of April 28, 2000, appellant had told what had happened earlier that evening. He said that he had asked Shawn McDaniels to point someone out. Shawn did so. Appellant then walked up to the man and said it was a robbery. When the man responded "I'm a cop," appellant panicked and shot him in the head. (IV-102-103).

Malinda Santell testified that on April 28, 2000, appellant told her that he had just shot a cop. He explained that he went to jack someone, that the individual said "I'm an officer," and that appellant then put the gun to the man's head and pulled the trigger. (IV-132, 138-139).

Misty Combs testified that in the early morning hours of April 28, she heard appellant state that he had tried to take a man's wallet and then shot him. (IV-156,160).

Cregg Simpkins testified that appellant said he had robbed someone and shot them. (IV-175,187-188). He testified that appellant had a .25 gun. (IV-189-190). Appellant twice asked to be taken so that he could "do what he had just done." (IV-192). Mr. Simpkins testified that the next day, appellant had the .25 automatic in pieces in a plastic bag which he gave to him and instructed him to get rid of it. (IV-204-205). Later, after a phone conversation with Misty Danielowiscz, Mr. Simpkins retrieved a .38 from a suitcase in appellant's room which he disposed of in the same area as the .25. (V-209-210). Sunday evening, Mr. Simpkins was questioned by Clay County detectives. The next day, he assisted the officers in locating the gun and gun pieces. (V-211-212, 215-217).

Officer Sean Douris of the Orange Park Police Department responded to 1465 Wells Road, the U-Scrub-Em Car Wash, at approximately 2:00 a.m. on April 28, 2000. (V-256-257). He located the victim beside a small blue car parked at one of the vacuum stations. He also located a small caliber shell casing. (V-257-259).

Crime Laboratory Analyst John Holmquist collected the cartridge casing for later testing. (V-279-286). He also obtained a bullet from the medical examiner's office which had been removed from the victim. (V-287-288).

-6-

Deputy Russell Monson located the frame of a .25 automatic on May 8, 2000, during a search in Georgia. (V-306-309).

Lieutenant Jimm Redmond testified that Mr. Simpkins assisted them in locating the slide from a .25 caliber automatic and a .380 automatic handgun. (V-322-326). Later the main frame of a .25 automatic was located. (V-328-329). On May 2, 2000, Lieutenant Redmond questioned appellant following his arrest. (V-329-340). Appellant had stated that Shawn McDaniel and John Creekmore had done the shooting. (V-349). Appellant then admitted that he had shot the man. (V-352). A sworn statement before a stenographer was then taken. (V-354-398; VI-400-441).

During cross-examination, appellant's counsel displayed Defendant's Exhibits A, B and C for Identification to the witness. Lieutenant Redmond identified the individual depicted in the pictures as appellant but indicated that appellant did not appear that way when he was interviewed in May. (VI-468).

Dr. Arruza, Acting Chief Medical Examiner, testified that from her autopsy of Richard Alexander Campbell on April 28, 2000, she determined the cause of death to be a gunshot wound to the head. (VI-486-496). State's Exhibit 21, the bullet removed from Mr. Campbell's head, was introduced into evidence. (VI-495-496).

Thomas Pulley, an expert in firearms examination, identification and ballistics, testified that the fired .25 caliber cartridge case and bullet (State's Exhibits 21 and 22) had been

fired from the .25 caliber frame and slide (State's Exhibits 2 and 3). (VI-500-509).

At the close of the State's case, appellant moved for a judgment of acquittal, which motion was denied. (VI-529).

Appellant testified that either John Creekmore or Shawn McDaniels shot the man. (VI-551-554). He acknowledged that he instructed Cregg to dispose of the gun. (VI-560). Appellant testified that when he was questioned at the Baker County Sheriff's Office, he had requested to be allowed to speak to an attorney. He testified that Lieutenant Bennett told him that he would force him to cooperate and flipped him over in the chair. He then yanked him back and slammed him in the chair. (VI-568-570). Bennett struck him in the stomach and ribs several times. (VI-570-571). Eventually, appellant said he would give a statement. (VI-573-). Before the court reporter arrived, Redmond went over with him what he was to say. (VI-574). Appellant testified that he told Officer Dees while he was being transported that he had been beaten up and forced to give a statement. (VI-576). Dees told him to get a hold of his attorney. (VI-576). About one to two weeks later they did take photographs. (VI-577).

On rebuttal, court reporter Vicki Eaves who took appellant's sworn statement, testified that she never left the room while the statement was being given. (VII-617-620).

During closing arguments, the State argued:

-8-

> While we're talking about this getting beat up,
> Mr. Eler made a big production in showing some
> photographs to Mr. Redmond and to the defendant
> about the defendant's injuries but he never put
> those photographs into evidence.

(VII-704). Appellant objected and moved for a mistrial. (VII-705-706, 718-733). Appellant's motion was denied.

The jury was instructed without objection. (VII-737-767).

During deliberations, the jury returned with a question to which the court responded without objection. (VII-768-770). Appellant did object and request a mistrial based upon the question. Appellant argued that the question demonstrated that the jury was confused by the jury instructions. The motion for mistrial was denied. (VII-770-771).

The jury returned a verdict finding appellant guilty of murder in the first-degree and guilty of attempted armed robbery with a firearm. (VII-772; I-149-150).

Appellant filed a timely motion for new trial. (I-169-171). The motion was denied. (I-172; II-220). Appellant was sentenced to life in prison on Count I and to fifteen years on Count II. (II-221; I-185-191).

Notice of appeal was timely filed. (I-195).

## SUMMARY OF THE ARGUMENT

Due process requires that the State bear the burden of proving beyond a reasonable doubt every element of a crime.  In recognition of that constitutional right, Florida prohibits prosecutorial comment which suggests that the defendant has an obligation to present witnesses.  In the present case, comments made by the prosecutor in closing argument improperly suggested that appellant bore the burden of proof to establish his innocence.  Since this prosecutorial misconduct infringed upon appellant's right to due process, a new trial must be awarded.

## ARGUMENT

### ISSUE I

THE TRIAL COURT REVERSIBLY ERRED IN OVERRULING APPELLANT'S OBJECTION AND MOTION FOR MISTRIAL WHEN THE PROSECUTOR, DURING CLOSING ARGUMENT, IMPROPERLY COMMENTED UPON APPELLANT'S FAILURE TO PRODUCE EVIDENCE IN CONTRAVENTION TO THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

It is well-settled that due process requires the State to prove every element of a crime beyond a reasonable doubt. Concomitantly, a defendant has no obligation to present witnesses nor does he bear any burden of proof to establish his innocence. In recognition of these Fourteenth Amendment due process guarantees, Florida considers verboten any comment by the State on a defendant's failure to produce evidence. See Jackson v. State, 575 So. 2d 181 (Fla. 1991).

A highly disputed issue at appellant's trial was the veracity of the "confessions" he had given law enforcement officers. Appellant claimed his statements were not true but had been made following physical violence inflicted upon him by the officer. (IV-568-576). Appellant indicated photographs of his injuries were taken about a week or two after his arrest. (VI-576-577). During closing arguments, the prosecutor argued:

> While we're talking about this getting beat up, Mr. Eler made a big production in showing some photographs to Mr. Redmond and to the defendant about the defendant's injuries but he never put those photographs into evidence.

-11-

* * *

And therefore, I submit to you it's not evidence.
(VII-704,706).   Appellant objected asserting the prosecutor's
argument was an improper  comment on defendant's failure to submit
evidence and moved for a mistrial.   (VII-705, 718-732).   The court
overruled the objection and denied the motion for mistrial.   (VII-
732).   In so ruling, the court reversibly erred.[1]

In <u>Jackson</u>, the Supreme Court clearly articulated the rule
against prosecutorial comment on the defendant's failure to present
evidence.   The Court stated:

> It is well settled that due process requires the
> state to prove every element of a crime beyond a
> reasonable doubt, and that a defendant has no
> obligation to present witnesses. Accordingly, the
> state cannot comment on a defendant's failure to
> produce evidence to refute an element of the
> crime, because doing so could erroneously lead the
> jury to believe that the defendant carried the
> burden of introducing evidence.   However, this
> Court has applied a narrow exception to allow
> comment when the defendant voluntarily assumes
> some burden of proof by asserting the defense of
> alibi, self-defense, and defense of others,
> relying on facts that could be elicited only from
> a witness who is not equally available to the
> state. A witness not equally available when there
> is a special relationship between the defendant

---

[1] While a ruling on a motion for mistrial is generally
subject to an abuse of discretion standard of review, the
<u>DiGuilio [v. State</u>, 491 So. 2d 1149 (Fla. 1986)] harmless error
analysis is required where the trial court failed to recognize
the error, overruled the objection and failed to give a curative
isntruction.   <u>Goodwin v. State</u>, 751 So. 2d 537, 546 (Fla. 2000)
('[u]se of a harmless error analysis under <u>DiGuilio</u> is not
necessary where, as occurred in <u>Goodwin</u>, the trial court
recognized the error, sustained the objection and gave a curative
instruction.").

and the witness. *State v. Michaels, 454 So. 2d
560, 562 (Fla. 1984); Buckrem v. State, 355 So. 2d
111, 112 (Fla. 1978); see also Brown v. State, 524
So. 2d 730, 731 (Fla. 4th DCA 1988); Romero v.
State, 435 So. 2d 318, 319 (Fla. 4th DCA 1983),
review denied, 447 So. 2d 888 (Fla. 1984);
Jenkins v. State, 317 So. 2d 90, 91 (Fla. 1st DCA
1975).*

Jackson at 188 (footnote omitted).    As noted in Rodriquez v.

State, 753 So. 2d 29, 39 (Fla. 2000):

Unless the circumstances fall within this 'narrow
exception,' these matters are not the subject of
fair comment and any comment 'fairly susceptible'
to being construed on the failure to mount a
defense is impermissible.

The circumstances of the present case do not fall within the

"narrow exception" referred to by the Court in Jackson.   The State

bears the burden of proof to establish that a defendant's alleged

statement was freely and voluntarily given.   Florida Standard Jury

Instructions (Criminal Cases) 2.04(e).    In challenging the

voluntariness of his statement, appellant did not assert an

affirmative defense nor did he rely upon facts that could be

elicited only from a witness who is not equally available to the

State.    Since appellant's challenge to his statement did not

present an affirmative defense for which he assumed any burden of

proof, the prosecutor's comment about appellant's failure to

introduce the photographs constitutes error.

In Jackson v. State, 690 So. 2d 714 (Fla. 4th DCA 1997), the

Fourth District held that the Jackson "exception" did not apply

where the defense merely asserted that the State had not proven the

-13-

essential elements of the offense.   Therein, Jackson was charged
with possession of cocaine and marijuana found in an apartment
during execution of a search warrant.   On the stand, Jackson denied
ownership or control of the apartment and denied any knowledge of
the presence of drugs within the apartment.   Jackson testified that
a co-worker had driven him to the apartment around midnight the
night before the search warrant was executed.   He said he partied
with others throughout the night until he passed out.   On cross-
examination, the prosecutor asked Jackson whether the co-worker
would have made a good witness and where he was at the time of
trial.   The Fourth District reversed Jackson's conviction because
the prosecutor's questions improperly suggested that the defendant
had the burden to call witnesses to prove his innocence.   The Court
noted:

> [I]n the instant case, appellant never raised an
> issue for which he carried, or voluntarily
> assumed, the burden of proof.   The State argued
> two theories under which Jackson would be guilty
> of possession:   (1) he admitted to the detectives
> that the drugs were his, or (2) he possessed the
> drugs because he was in control of the apartment.
> Jackson's defense was that the apartment was not
> his and that he was only present on the morning
> that the police executed the search warrant
> because he had attended a party there on the
> evening before, became intoxicated and passed out,
> that he was unaware that there were any drugs in
> the apartment, and that he did not state to the
> police officer that the drugs were his.   This
> defense amounts to nothing more than a denial that
> the elements of the crime have been established.

Jackson, 690 So. 2d at 716.

-14-

Likewise, in <u>White v. State</u>, 757 So. 2d 542 (Fla. 4th DCA 2000), a prosecutor's comment on the defendant's failure to call witnesses was held to be error.   White, who was convicted of trafficking in cocaine, testified that the package of drugs found in his suitcase had been given to him by Charles, a friend of his cousin, Theron Peterson, to be delivered to Charles' girlfriend, Sheila.   White denied knowledge that the package contained drugs. In condemning the prosecutor's comments on White's failure to call Charles or Theron as witnesses, the Fourth District stated:

> Clearly, a defendant who takes the stand to testify places his credibility in issue, just as any other witness.  He subjects himself to close scrutiny by the jury and takes the risk of having his testimony torn apart by a skillful cross-examiner, who may expose certain contradictions, fallacies, and absurdities in his version of events.   But, because a criminal defendant is presumed innocent and the state has the burden of proving guilt on all elements of the offense, the prosecutor must stop short of inquiring about witnesses the defendant failed to call to support his story.   Otherwise, the jury will be led to believe that the defendant has an obligation to produce these witnesses and to prove his innocence.   In this case, when the prosecutor asked appellant why he did not call Theron and Charles as witnesses, she suggested that he was obligated to call them and to prove that he did not know the package contained cocaine.   In other words, the prosecutor's comments improperly led the jury to believe that the burden of proof on the element of knowledge shifted to the defendant. This conduct infringed upon appellant's right to due process. *Jackson*, 575 So. 2d at 188.

<u>White</u> at 546-547 (footnote omitted).   <u>Accord</u>, <u>Gutierrez v. State</u>, 798 So. 2d 893 (Fla. 4th DCA 2001).

Here, as well, the prosecutor's comments regarding appellant's failure to introduce the photographs into evidence to support his story improperly suggested that appellant was obligated to produce evidence.   As in the foregoing cases, this comment infringed upon appellant's right to due process.   The trial court's error in overruling appellant's objection and denying his motion for mistrial cannot be deemed harmless beyond a reasonable doubt as required by <u>DiGuilio</u>.  Accordingly, appellant must be awarded a new trial.

## CONCLUSION

Based upon the argument and citations of authority presented in Issue I, appellant must be awarded a new trial.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to **JAMES W. ROGERS**, Assistant Attorney General, The Capital, Tallahassee, FL 32399-1050, and to appellant, **JOHNNY EMERY**, #125075, Holmes Correctional Institution, 3142 Thomas Drive, Bonifay, FL 32425, on this date, June 28, 2002.

## CERTIFICATE OF FONT SIZE

I HEREBY CERTIFY that, pursuant to Fla. R. App. P. 9.210(a)(2), this brief was typed in Courier New 12 point.

Respectfully submitted,

NANCY A. DANIELS
PUBLIC DEFENDER
SECOND JUDICIAL CIRCUIT

**GLENNA JOYCE REEVES**
Assistant Public Defender
Florida Bar NO. **0231061**
Leon County Courthouse
301 South Monroe Street, Suite 401
Tallahassee, FL 32301
(850) 488-2458
COUNSEL FOR APPELLANT

-17-